# EXHIBIT
# A

Filing # 246521797 E-Filed 04/21/2026 04:22:05 PM

*MG*
*1556*
*04-2328*
*2:00p.m*

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

**SAVANNAH WILKES,**
Plaintiff,

**CASE NO.: CACE-26-006549**
DIVISION:

v.

**NOVA SOUTHEASTERN UNIVERSITY, INC.,**
Defendant.

_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and a copy of the complaint in this action on defendant:

**TO: NOVA SOUTHEASTERN UNIVERSITY, INC. (Defendant)**

c/o Registered Agent: Somerstein, ESQ, Barry E., NOVA SOUTHEASTERN UNIVERSITY, INC. ATTN: OFFICE FOR LEGAL AFFAIRS

3300 S. UNIVERSITY DRIVE

FORT LAUDERDALE, FL 33328-2004

The Defendant is required to serve written defenses to the Complaint to Plaintiff's attorney, whose name and information is: **Zachary Gaynor, Esq.**

Primary Email: Zacharysgaynor@gmail.com

Phone number: 561-308-9119

https://FLeducationlawyer.com/

8903 Glades Rd, Ste A8 #2322, Boca Raton, FL 33434

within 20 days after service of this Summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint.

APR 22 2026

DATED on _____.

_____
As Clerk of the Court

(SEAL)

By: _____
As Deputy Clerk

**BRENDA D. FORMAN**

Case Number: CACE-26-006349 Division: 25
Filing # 246434225 E-Filed 04/20/2026 08:53:57 PM

# IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
## IN AND FOR BROWARD COUNTY, FLORIDA

SAVANNAH WILKES,

      Plaintiff,

v.

                                                    CASE #.: _____

                                                    Judge: _____

NOVA SOUTHEASTERN UNIVERSITY, INC.,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Savannah Wilkes ("Plaintiff"), by and through undersigned counsel, sues Defendant Nova Southeastern University, Inc. ("NSU" or "Defendant"), and alleges as follows:

## JURISDICTION AND VENUE

1. This is an action for damages in excess of $50,000.00 (exclusive of interest, attorneys' fees, and costs), and for declaratory and injunctive relief, and for such other relief as the Court deems just and proper.

2. This Court has subject-matter jurisdiction pursuant to Article V of the Florida Constitution and section 26.012, Florida Statutes. To the extent Plaintiff asserts claims arising under federal law, this Court has concurrent jurisdiction over those claims.

3. This Court has personal jurisdiction over NSU because NSU is a Florida corporation with its principal place of business in Broward County, Florida, and because the acts and omissions giving rise to this action occurred in Broward County, Florida.

4. Venue is proper in Broward County because NSU is located in Broward County and/or the causes of action accrued in Broward County.

5. All conditions precedent to bringing this action have been performed, have occurred, or have been waived or excused.

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 04/20/2026 08:53:56 PM.****

## PARTIES

6. Plaintiff, Savannah Wilkes, is a natural person over the age of eighteen and a resident of Colorado.

7. Defendant, Nova Southeastern University, Inc., is a private university organized and existing under the laws of the State of Florida, with its principal place of business located at 3300 S. UNIVERSITY DRIVE, FORT LAUDERDALE, FL 33328-2004.

8. NSU receives federal financial assistance and is therefore subject to Section 504 of the Rehabilitation Act of 1973, which prohibits disability discrimination in education programs.

9. At all material times, NSU acted through its officers, agents, employees, faculty, and committees, who acted within the course and scope of their employment or agency and/or with actual, apparent, and/or implied authority.

### Preliminary Statement

This case is about a student who managed to pass all her classes her first three semesters, going into her fourth semester she disclosed her disabilities and requested accommodations. That semester she was referred to the Committee on Student Progress for "behavior and professionalism" issues, then after one professor wasn't in on the plan and told Plaintiff that her referral doesn't rise to the level of dismissal, a professor in on the plan manufactured a reason on how she failed a course. This wouldn't have even been a problem, if it wasn't also for the fact that NSU on the day of orientation in May 2021 informed the students, for the first time ever, that they were the last cohort of students in the Masters of Occupational Therapy (M.O.T) program.[1] Only after that announcement and the start of the semester did NSU go forward and edit its website and state that information, along with the course catalog.

The Office of Student Disability Services at NSU failed Plaintiff and didn't even attempt at providing an individualized, interactive accommodation process. Run by Dr. Jennifer Wilson[2] and guidance/direction provided by NSU's outside counsel, the office is everything a University Office of Student Disability Services shouldn't be. Not a single meeting or call occurred between

---

[1] See Exhibit A which is the website from May 2021 that does not indicate any indication that the M.O.T program was about to end and then the August 2021 version of the website which states "NSU's Master of Occupational Therapy (M.O.T.) program is transitioning to a Doctor of Occupational Therapy (O.T.D.) program and is no longer accepting new applicants."
[2] Not a licensed medical professional.

Plaintiff and anyone at the Office of Student Disability Services. In fact, such a lack of individualized attention was provided that the Office of Student Disability Services couldn't even be bothered to change its canned pre-written accommodation to provide Plaintiff's individualized gender just saying "his /her" when they sent the approved accommodations. Additionally, the Office of Student Disability Services, under the leadership of Dr. Jennifer Wilson, hasn't adjusted any of their documentation guidelines in over ten years, despite the DSM guidelines being updated numerous times since then. Plaintiff was left to have to negotiate with her professors whenever she wanted to use her classroom accommodation and her exam accommodations were not consistently provided.

During the ill-fated fourth semester Plaintiff alleges that faculty used the very accommodation language "drafted" by NSU against her, invoking "per your accommodations" and insisting that they needed to adhere to the accommodation "as it is written," thereby transforming a burdensome and ineffective process into a tool of blame rather than support. This is in contrast to the more lenient policies applied to all other students. These facts, taken together, support an inference of inadequate training, poor institutional oversight, and disability policies that shifted the burden of obtaining access onto the disabled student herself.

Then, despite Plaintiff receiving a final grade of 83.6% in a course well above the 78% requirement, Defendant arbitrarily and capriciously provided Plaintiff with a F, going as far as to change future course catalogs minimum course passing grade requirements to cover its tracks. Then, even assuming the failure was accurate, the policy still allowed Plaintiff to retake the course at the next course offering, except due to Defendant's actions there was no next course offering and even though she objectively did not meet any standards for Dismissal, the school classified her as a "dismissed" student, which has negatively impacted her and continues to negatively impact her.

## General Allegations

10. The NSU Florida Health Professions Division 2021-2022 Catalog includes in it the requirements for Graduation with the Masters in Occupational Therapy (M.O.T.) degree.
11. In order to be eligible for the M.O.T. degree based on the 2021-2022 Catalog, students shall: (1) be of good moral character; (2) have satisfactorily completed the program of study required for the degree with a minimum grade of 78 percent in each OCT course; 75 percent

in anatomy, physiology, and neuroanatomy; and a minimum cumulative GPA of 2.3; (3) have satisfactorily met all financial and library obligations to the university; and (4) successfully complete Level II fieldwork within 24 months of completion of didactic courses.

12. The 2020-2021 catalog also contained the same language, including the minimum grade of 78 percent in each OCT course language.

13. The NSU M.O.T. degree is accredited by the Accreditation Council for Occupational Therapy Education ("ACOTE") and ACOTE sets accreditation standards that NSU's M.O.T. program needs to follow.

14. ACOTE Accreditation Standard A.3.4 Criteria for successful Completion states that "Criteria for successful completion of each segment of the educational program and for graduation must be given in advance to each student."

15. ACOTE Accreditation Standard A.4.1. Public Information & Policies states: "All program publications and advertising-including, but not limited to, academic calendars, announcements, catalogs, handbooks, and websites-must accurately reflect the program offered.

16. ACOTE Accreditation Standard A.4.4. Published Policies and Procedures: "The program must have documented policies and procedures, which are made available to students and ensure the consistent application of each of the following: • Policy and procedures for processing student and faculty grievances must be defined and published. • Student withdrawal and refunds of tuition and fees must be published and made known to all applicants. • Student probation, suspension, and dismissal must be published and made known…. • Graduation requirements, tuition, and fees must be accurately stated, published, and made known to all applicants. When published fees are subject to change, a statement to that effect must be included. This includes fees associated with distance education."

17. ACOTE Accreditation Standard A.4.6. Progression, Retention, Graduation, Certification, and Credentialing Requirements: "Documentation of all progression, retention, graduation, certification, and credentialing requirements must be published and made known to applicants…."

18. On or about March 29, 2021 Plaintiff was accepted into the Master of Occupational Therapy Program within the Health Professions Division of Nova Southeastern University.

19. Acceptance into the program triggered the "Acceptance and Preregistration Fee—$1,000. This fee is required to reserve the accepted applicant's place in the entering first-year class. This advance payment will be deducted from the tuition payment due on registration day, but is not refundable in the event of a withdrawal. It is payable within four weeks of an applicant's acceptance or by April 15, whichever comes first."

20. Plaintiff made timely payment of the $1,000 fee.

21. The requirements to graduate upon Plaintiff's acceptance, paying the $1,000 deposit, and starting were:

    a. "be of good moral character

    b. have satisfactorily completed the program of study required for the degree (98 semester hours) with a minimum grade of 78 percent in each OCT course; 75 percent in anatomy, physiology, and neuroanatomy; and a minimum cumulative GPA of 2.3

    c. have satisfactorily met all financial and library obligations to the university

    d. successfully complete Level II fieldwork within 24 months of completion of didactic courses"

22. Plaintiff's acceptance letter did not indicate that the program was being terminated in the near future and/or that this was the last cohort starting in the program.

23. On or about May 2021, at orientation for the M.O.T. program, Plaintiff and her cohort were first alerted that their program was ending, this information was not published on the NSU website. See Exhibit A (showing the website without a disclaimer and/or notice in May 2021).

24. At some point between May 2021 and August 2021, NSU updated its website to indicate that it was no longer accepting applications to the M.O.T. program. See Exhibit B (showing website with a disclaimer and/or in August 2021).

25. On or about May 24, 2021, Plaintiff's course taught by Dr. Anastasia Mashukova allowed students to attend the course either in person or via zoom.

26. Many of the course syllabuses in the M.O.T. program include the following: "Assignments submitted after the due date and time will incur a reduction of 10% of the potential points of the assignment per calendar day.  Exceptions are at the discretion of the professor and will only be made if arrangements have been made with the professor prior to the original due date...."

27. On or about July 9, 2021, Dr. Margo Kreger, a Director of the program Plaintiff was in, offered students the ability to attend class sessions both in person or on zoom.

28. On or about July 19, 2021, Dr. Anastasia Mashukova for the Exam 3 located in Canvas using Respondus Lockdown Browser stated "You may use blank scratch paper or a whiteboard."

29. On or about July 26, 2021, Plaintiff disclosed in a course assignment for her Fieldwork Experiences I court taught by Heather Knoeferl, Plaintiff disclosed that she had autoimmune health issues and suffered from anxiety and depression.

30. Plaintiff further disclosed that she was unable to control these fully and wanted these diagnoses to be taken into consideration by the school.

31. Plaintiff provided her disability related information in order to ensure the school was aware and so Plaintiff could receive the appropriate accommodations.

32. On or about September 21, 2021, approximately five hours prior to a scheduled lecture, Dr. Margo Kreger sent a message to the course participants, Plaintiff included, that she would be pre-recording the lecture actually and not holding a "live session" due to a holiday.

33. On or about October 19, 2021, Dr. Margo Kreger stated in an email to Plaintiff that she knows that Plaintiff knows more than Plaintiff's test grades reflected.

34. On or about October 20, 2021, a student in the NSU M.O.T. program whom Plaintiff was friends, with committed suicide.

35. On or about October 20, 2021, Plaintiff found out about her friend's suicide, which was distressing to Plaintiff.

36. On or about October 21, 2021, Plaintiff messaged her NSU professors Jamie Fine and Danielle Barber to inform them that she was struggling with her mental health as she also had two recent deaths in her family.

37. On or about October 25, 2021, in a message sent to Jamie Fine and Danielle Barber Plaintiff stated: "To be completely honest I am not doing well mentally. Given the loss in my family, the tragedy in our department, and in general the depression I suffer from, things are becoming hard to manage. So I think it's best for me to spend some time at home with the support of my family…"

38. On or about October 26, 2021, Danielle Barber messaged Plaintiff back stating "Thank you for keeping us updated and confiding in us about the difficulty you're having…your mental health should come first…"

39. On or about October 26, 2021, Dr. Margo Kreger addressed Plaintiff's class as a whole regarding the death of their peer and the associated coping issues.

40. On or about October 26, 2021, Plaintiff responded to Dr. Margo Kregar's message stating: "....I had a death in my family, then with tragedy in the program, plus the depression I suffer from normally I'm honestly struggling mentally. So I decided to come home to have the support of my family, plus I'll be attending a funeral. I'll do whatever is necessary so I stay caught up…"

41. On or about October 27, 2021, Dr. Margo Kreger said "I know that I can get you where you need to be. You are an excellent student always willing to learn. I will miss your enthusiasm in the lab this week. I do understand the need to be with family. Family is helping me to cope as well…"

42. On or about January 22, 2022, Plaintiff told Jamie Fine that she was "working with the school counselor as you recommended. I'm genuinely trying to not let my mental health affect me this semester…"

43. On or about February 7, 2022, Plaintiff messaged Jamie Fine that she was "... struggling mentally, my depression and anxiety are high"…" and that she had upcoming appointments with her therapist and psychiatrist to help with her mental struggles.

44. On or about February 18, 2022, Plaintiff met with her academic advisor due to Plaintiff reaching out due to her mental health concerns and her desire for accommodations.

45. During the February 18, 2022 meeting, Plaintiff disclosed that she took medication, had upcoming medical adjustments because her anxiety and depression are increasing causing her to have a difficult time to focus in class, and that she had an autoimmune disability which made it difficult just getting out of bed somedays.

46. When asked during the February 18, 2022 meeting, about what accommodations would assist Plaintiff in the program, Plaintiff stated: increase time for exams, exams in a separate room from peers to reduce distractions, and to have a blank paper during exams.

47. During the February 18, 2022 meeting, Plaintiff was told that Dr. Paula Lowrey required Plaintiff to provide documentation from a mental health provider stating she can continue in the program and what she needs to continue to support her health.

48. In the meeting notes from the February 18, 2022 meeting, Dr. Margo Kreger stated that Plaintiff followed through with instruction from emails on communicating with instructors regarding assignments.

49. On or about March 6, 2022, Plaintiff in that message to Jamie Fine stated that she struggled to get to class and was requesting an accommodation to allow a zoom option for her to attend.

50. On or about March 6, 2022, Plaintiff messaged Jamie Fine that she was going to receive a letter from her therapist about her state and try to get accommodations, and the letter was requested by Dr. Paula Lowery.

51. On or about March 8, 2022, Plaintiff reached out to NSU professor Danielle Barber stating that she was "...really struggling and I don't know why or what to do...."

52. On or about March 9, 2022, Plaintiff submitted the Academic Accommodation Request Form to the Office of Student Disability Services and provided a Release of Information Forms listing Attention Disorders and Psychological and Psychiatric Disabilities and listed the following as the specific Accommodations being requested: Test taking - private testing / more time, additional time on assignments, tutoring, and a "note to attend class via zoom - not just related to covid or being sick."

53. Dr. Jennifer Wilson is the Director at the NSU Office of Student Disability Services who was responsible for the documentation guidelines which were outdated and not updated in over ten years.

54. On information and belief, NSU had outside counsel draft and review the Student Handbook policies and develop and implement its Student Disability policies.

55. On or about March 9, 2022, Plaintiff after class meet with Danielle Barber to discuss Plaintiff's mental health needs and that she was working with the office of student disabilities service to get accommodations.

56. On or about March 10, 2022, Danielle Barber told Plaintiff via email that she and Elisa Bloch will be providing some course specific tips and suggestions to Dr. Margo Kreger as they relate to Plaintiff.

57. On or about March 23, 2022, approximately two weeks after Plaintiff's request, the Office of Student Disability Services, responded to Plaintiff's request asking for additional information and stating in essence that they have not started to evaluate her accommodation request.

58. On or about March 23, 2022, Plaintiff promptly responded to the Office of Student Disability Services request and provided the requested information.

59. The Office of Student Disability Services did not confirm receipt of this information with Plaintiff nor provide Plaintiff with any interim accommodations.

60. On or about April 6, 2022, due to not receiving any confirmation of receipt or any correspondence with the Office of Student Disability Services, Plaintiff reached out requesting an update and ensured all information was received.

61. On or about April 8, 2022, instead of responding directly to Plaintiff's email in the same email chain, the Office of Student Disability Services creates, for reasons unknown except to confuse and prevent proper documentation, that it "...can take two to four weeks to review documentation when experiencing a high volume of requests. Our office is working diligently to respond to all requests as quickly as possible, and we will do our best to provide you with a determination as soon as we are able to."

62. On information and belief, the NSU Office of Student Disability Services was not experiencing a "high volume of request..." during this time frame.

63. On information and belief, the NSU Office of Student Disability Services does not work diligently to respond to "...all requests as quickly as possible..." but does provide the determination to students without any additional communication between the students and them.

64. On or about April 8, 2022, Plaintiff messaged Professor Vanessa Johnson after her group kicked her out of their group stating "So it was just brought to my attention that I was separated from my group but I'm not sure why. If my peers didn't want me to be in a group with them that's okay but I would like to at least know why I was booted. I would like to stay in group 4 if possible. Since I've already contributed time and effort into that group..."

65. On or about April 12, 2022, Plaintiff messaged NSU professor Sarah Mbiza regarding her group co-leader bullying her and that she was upset.

66. On or about April 13, 2022, Danielle Barber emailed Plaintiff stating: "I discussed your request for testing compensatory strategies for the final exam. As we discussed, we can't provide you with any formal accommodations, but it is alright if you use something like ear plugs or ear muffs (anything to cover your ears that aren't connected to any electronic device

or wireless capability). You can also sit in the back of the room. Let me know if you have any questions."

67. On or about April 18, 2022, the NSU Office of Student Disability Services, reached out to Dr. Paula Lowrey presented the "drafted approved accommodations memo" for Plaintiff and asked her if she could "review the approved accommodations and let our office know if you have any feedback" and six minutes later Dr. Paula Lowrey responded "Yes, this looks fine."

68. On or about April 18, 2022, Plaintiff received notification from the NSU Office of Student Disability Services of the accommodations that were "...being offered/granted to..." her and that to complete the process she had to "...read, initial, and return electronically the attached agreement..." and then "...Dr. Paula Lowrey will be notified of accommodations..." and that she would be her ADA contact thus to "...contact Dr. Paula Lowrey she can explain how your accommodation will be provided along with the testing protocol for all students..."

69. Plaintiff's only approved classroom accommodation was: "Extended time to complete assignments, when necessary and mutually agreed upon by student and faculty member.* It is not expected that the student will need an extension on every assignment. It is meant to be used only when the student's disability impacts his/her ability to complete an assignment by the expected deadline. The student is expected to keep current on all assignments and requests for extensions should be made PRIOR to the deadline.**Faculty will determine how much extra time will be allowed on a given assignment - usually days, not weeks. Faculty will determine what is reasonable and new deadlines are negotiated between student and professor. Once a new deadline has been established, student is expected to meet that deadline and faculty are not required to provide further extensions on that assignment...."

70. Plaintiff alleges that this accommodation is useless, pointless, unduly burdensome, and as will be alleged later, was used to the detriment of Plaintiff's academic standing by Defendant.

71. Plaintiff's alleged accommodation, which is significantly different from the one that she requested, placed an undue burden on Plaintiff and created a pathway that did not different from what was in place previously.

72. Plaintiff further alleges that the thought of having to "negotiate" with her professors in order to utilize her approved accommodation placed an undue burden on her.

73. This accommodation was also not an individualized accommodation as in the text it was clearly just copy and pasted as it includes a "his/her" descriptor a hall-mark trait of an off the rack non-individualized accommodation.

74. Plaintiff never used this accommodation because it was unreasonably difficult and combative, but NSU employees as will be discussed later used this unreasonable accommodation to justify its retaliatory and discriminatory actions towards her.

75. For exam accommodations Plaintiff was approved for 1.5x the amount of time allowed and a reduced distraction setting that may include other accommodated students also testing.

76. Plaintiff alleges that based on her documentation that she should have been approved for double time.

77. Plaintiff alleges that in her request she requested a private testing room and this granted accommodation was fundamentally different and did not alleviate her disability related limitations.

78. Plaintiff further alleges that the restriction on the time and a half accommodation to not apply to "...unannounced (pop) quizzes/exams, take home exams, labs, practical exams, clinical exams, or phonological transcriptions..." was without basis, rational, or individualized considering given to Plaintiff's needs.

79. On or about April 25, 2022, Cheryl Purvis asked Plaintiff if she was able to get a copy of the Neuro Practice Final from 2020, and that maybe Plaintiff could get a copy from a classmate.

80. Plaintiff was unable to get a copy from her classmates as they were isolating and bullying her.

81. On or about April 26, 2022, Paula Lowrey emailed Nardia Aldridge, Vanessa Johnson, Helene Lieberman, Heather Knoeferl, Melissa Schaeffer, Nicole Quint, Elisa Bloch, Danielle Barber, Margo Kreger, Elise Bloch, and Ricky Davenport, Plaintiff's list of approved academic accommodations.

82. On or about May 25, 2022, Plaintiff had an appointment for her autoimmune conditions and her swollen throat and her medical provider advised her to have a medicine adjustment.

83. On or about May 31, 2022, Plaintiff reached out to the NSU Office of Student Disability Services email to ask about her accommodations and a few days later the NSU Office of Student Disability Services responded telling Plaintiff to work with the program director.

84. On or about May 31, 2022, Dr. Melissa Schaeffer emailed Plaintiff and used her accommodations against her by stating "Per your accommodations" when Plaintiff never

made a request nor ever ended up making a request as part of her accommodations for missing a class session.

85. On or about May 31, 2022, Dr. Melissa Schaeffer emailed Plaintiff and used her accommodations against her by stating "Per your accommodations" when Plaintiff never made a request nor ever ended up making a request as part of her accommodations.

86. On or about June 1, 2022, Dr. Jamie Fine, without Plaintiff ever responding, further used Plaintiff's accommodations against her stating "...we need to adhere to the accommodation as it is written…."

87. Dr. Jamie Fine in her very own syllabus states ""...Assignments submitted after the due date and time will incur a reduction of 10% of the potential points of the assignment per calendar day. Exceptions are at the discretion of the professor and will only be made if arrangements have been made with the professor prior to the original due date…"

88. Thus, it is unreasonable and discriminatory for Dr. Jamie Fine to use Plaintiff's accommodations as a sword against her instead of just citing to her general syllabus policy that applies to all students.

89. The classroom accommodation NSU approved required Plaintiff to negotiate extensions on an assignment-by-assignment basis with individual faculty and did not provide clear, consistent, or predictable access to accommodations when disability symptoms affected performance. As a result, Plaintiff was deterred from use and the accommodation did not effectively mitigate disability-related barriers.

90. On or about June 1, 2022, Plaintiff informed Sarah Mbiza and Danielle Barber that she was not feeling well and would not be in class because she was sick and provided a letter from a medical provider stating no school until June 3, 2022 and Plaintiff could return June 4, 2022.

91. On or about June 9, 2022, due to issues Plaintiff was having with utilizing her approved accommodations was sent a message by Jamie Fine reaching out to her to meet with Plaintiff to discuss the process to use her accommodations when she is "...not feeling well."

92. On or about June 10, 2022, Plaintiff met with Dr. Margo Kreger for her semester meeting and as alleged by Dr. Margo Kreger it was also for her "professional behavior concerns."

93. In this email Dr. Margo Kreger engaged in hostile and abrasive tactics without regard to any of the medical conditions Plaintiff previously disclosed nor engagement or investigation into how Plaintiff was being bullied.

94. On or about June 10, 2022, during Plaintiff's meeting with Dr. Margo Kreger they discussed Plaintiff's note-taking and how Plaintiff struggled with it due to her disability.

95. On or about June 28, 2022, Plaintiff had her Occupational Therapy Practice for Mental Health and Wellness ("OCT 6106"), midterm exam and she did not receive her approved accommodations for the examination.

96. As a result of Plaintiff not receiving her approved accommodations on the OCT 6106 midterm examination, Plaintiff's examination score was lower than it would have been had she been provided with her approved accommodations.

97. Plaintiff prior to the exam and after the exam provided NSU with notice of her accommodations and the professors, Sarah Mbiza and Danielle Barber, had actual notice of Plaintiff's accommodation as alleged above.

98. On or about July 5, 2022, Dr. Margo Kreger sent Plaintiff a list to a number of recordings on note-taking based on Plaintiff's struggle with note-taking.

99. Dr. Margo Kreger was aware of Plaintiff's disability related limitations with regards to her note-taking abilities.

100. On or about July 29, 2022, Plaintiff was, for the first time in what Plaintiff's alleges was discrimination and/or disability retaliation, informed via email from Dr. Danielle Barber, who CCed Dr. Paula Lowrey and Dr. Margo Kreger, that Plaintiff since the midterm exam was allegedly having some professional behavior issues and that these issues needed to be discussed and documented.

101. On or about August 1, 2022, Dr. Margo Kreger and Dr. Melissa Schaeffer submitted a referral regarding Plaintiff to the Committee on Student Progress for the following issues: Academic issue, violation of professional or behavioral code of conduct, and inability to meet OT essential functions (workload and accepting responsibility).

102. The referral contained some very unreasonable, burdensome, and without any degree of relation to Plaintiff's disabilities or within the bounds of what is appropriate.

103. Within the referral Dr. Margo Kreger and Dr. Melissa Schaeffer berated Plaintiff excessively because she made the decision to wait for her M.O.T. program specific pants to dry, which are required to be worn as per the dress code, instead of wearing alternative attire which based on the programs policies could have resulted in Plaintiff being referred to the Committee on Student Progress, thus Plaintiff was making an objectively rationale choice.

104. Plaintiff alleges, despite what Dr. Margo Kreger and Dr. Melissa Schaeffer false proclaim about this being a lack of "problem solving skills" that this was actually very much a decision based on the policies that penalize much grader for not wearing the pants as per the dress code as opposed to being late.

105. Dr. Margo Kreger and Dr. Melissa Schaeffer also submitted the referral stating that Plaintiff "... expressed not knowing she had accommodations despite being shown the accommodations from the student disability services center she had signed…" which is inherently discriminatory and on its very face is retaliatory.

106. As stated in the CSP referral, Plaintiff was previously told that she should save a text so "...she could send in the moment of crises to enhance her communication and to take responsibility, but she did not follow through with this request..."

107. Dr. Margo Kreger is very much aware of Plaintiff's mental health issues and in the event of a crisis to require her to send a text message in the middle of the crises is discriminatory especially since in Dr. Margo Kreger's very own syllabus she states that students suffering an "…emergency, such as a flat tire, accident, or medical emergency…" to "...please contact that faculty member as soon as possible during that business day…." a much more reasonable policy to allow the emergency to subside prior to sending the communication as opposed to requiring the text to be sent in the "...moment of crises…"

108. Dr. Margo Kregar and Dr. Melissa Schaeffer was thus setting requirements of Plaintiff that were not applicable to other students using her accommodations against her.

109. Dr. Margo Kregar and Dr. Melissa Schaeffer cited as one of the reasons for their referral to the committee on student progress was that Plaintiff does "not communicate as per accommodations when requiring extension on assignments or need to miss class."

110. Plaintiff is not approved for accommodations with regards to needing to miss class.

111. Plaintiff has never used the burdensome and anxiety-inducing negotiation process framework forced upon her by the NSU Office of Student Disability Services.

112. Dr. Margo Kregar and Dr. Melissa Schaeffer prior to referring Plaintiff to the committee on student progress for an inability to meet OT essential functions did not perform any analysis on whether it could be met with appropriate accommodations.

113. On or about August 2, 2022, Dr. Margo Kreger emailed Plaintiff stating: "In talking to your professors and recognizing the struggles you are experiencing in the classroom, Dr.

Schaeffer and I have referred you to CSP to see if they are able to help you in progressing in your coursework next semester. You have struggled each semester and the rigor will be increasing. The action plan does not appear to be assisting you. Perhaps, they will have suggestions to assist you in moving forward."

114.   On or about August 5, 2022, Dr. Heather Knoeferl emailed Plaintiff formally informing her that she was being referred to the Committee on Student Progress ("CSP") scheduled for August 16, 2022.

115.   On or about August 6, 2022 Plaintiff responded expressing her concerns and the overwhelming nature of the referral she just received in the mist of final exam week.

116.   On or about August 7, 2022, Dr. Heather Knoeferl responded stating that the CSP can be a means to evaluate dismissal but that Plaintiff's "...case does not rise to that level..."

117.   On or about August 9, 2022, Plaintiff finished her course OT Practice for Mental Health & Wellness (OCT6106) receiving 836 out of 1,000 points for a final percentage average of 83.6%.

118.   On or about August 15, 2022, Dr. Sarah Mbiza referred Plaintiff to the committee on Student Progress for what was checked Academic issues and Violation of professional or behavioral code of conduct.

119.   As per the requirements for graduation in the M.O.T. program students need to receive a "minimum grade of 78 percent in each OCT course."

120.   On or about August 15, 2022, Dr. Paula Lowrey after just receiving the referral and before any hearing or due process took place stated in an email while including Nardia Aldridge, Heather Knoefler, Danielle Barber, and Sarah Mbiza on the email that: "This is a year 2 student and it appears will have to start over in the OTD so Tamara needs to know and the Dean if she chooses."

121.   On or about August 16, 2022, Plaintiff had her first hearing in front of the Committee on Student Progress regarding her first referral.

122.   On or about August 18, 2022, Dr. Heather Knoeferl emailed Plaintiff formally informing her that she was being referred again to the Committee on Student Progress ("CSP") scheduled for August 23, 2022 for alleged "Academic Issues: Course failure for OCT 6106 OT Practice for Mental Health & Wellness" and "Violation of professional or behavioral code of conduct: Class attendance" for 11:30am.

123.    On or about August 22, 2022, Dr. Heather Knoeferl emailed Dr. Tamara Pinchevsky regarding how Plaintiff could be enrolled when she allegedly "failed a prerequisite course?"

124.    The educational records inspected do not provide an answer because the answer is that Plaintiff did not fail any course.

125.    On or about August 23, 2022, Plaintiff had her CSP hearing which based on the conduct and the way it was conducted, there was a predetermined outcome and Dr. Terry Morrow Nelson was one of the voting committee members.

126.    During this meeting she informed the committee members that she had ADHD and she was still working on finding accommodations that suit her needs.

127.    During the meeting Heather Knoeferl told Plaintiff that Dr. Pinchevsky-Font would be making the final decision about how Plaintiff would proceed and that Dr. Pinchevsky-Font "...will contact her via email and mail within 10 days of hearing..."

128.    Dr. Pinchevsky-Font never contacted Plaintiff by email or mail after the hearing.

129.    On or about August 23, 2022, Dr. Heather Knoeferl emailed Tamara Pinchevsky the CSP report at 3:39pm and then at 4:46pm Tamara Pinchevsky sent it to Plaintiff just mere hours after the hearing.

130.    On or about August 23, 2022, after receiving both of the CSP results Plaintiff was left confused because of the lack of clarity and puzzling nature of the CSP reports, she even asked after reviewing both if it meant she was continuing in the Master's program or if she was being dismissed.

131.    In response Tamara Pinchevsky falsely stated that "Due to our policy on course failure, it's a dismissal."

132.    In the alleged "Dismissal letter" it states in bold that "A course may be repeated only once. Students will be dismissed from the program after two course failures..."

133.    Plaintiff didn't even fail one course, let alone two courses.

134.    On or about August 23, 2022, Plaintiff asked Tamara Pinchevsky about why there was no discussion about her accommodations or medical diagnosis that they had information on within the hearing.

135.    Tamara Pinchevsky insisted that the "...goal of the accommodations that you were granted is for student success..." which is ironic considering that prior to requesting any

accommodation she had three successful semesters and the only semester that was not successful was after she was granted accommodations.

136. Plaintiff responded to Tamara Pinchevsky and stated that she did not believe that her accommodations were properly provided to her or taken into consideration.

137. On or about August 25, 2022, in response to Plaintiff's statement that no one has explained the process for joining the OTD program or what it means, Dr. Margo Kreger attempted to dissuade Plaintiff from pursing it and instead look at an OTA program and to also have her reflect on why she struggled specifically "Was it the number of classes you were taking? Did you have the supports in place to be successful…"

138. On or about September 18, 2022, Plaintiff asked about the appeal process for academic dismissal to the NSU Register office.

139. NSU did not explain the process and instead proceeded to promptly lock Plaintiff out of her NSU email address account after Plaintiff inquired into that.

140. On or about October 5, 2022, Dr. Margo Kreger in an email to Plaintiff stated: "…I would recommend applying to OTA programs to see if you have more success in being accepted into the program, especially if they are a community college. You can always look at pursuing an OT degree later through a bridging program. OTAs have more hands-on experiences than OTs with the exception of pediatrics. I recommend taking this year to get the support needed to be successful in place….."

141. On or about October 5, 2022, Plaintiff responded to Dr. Margo Kreger's email stating that the issues stemmed from her disabilities, lack of proper accommodations, and bullying/isolation from her classmates.

142. On or about October 31, 2022, despite Plaintiff not having met the criteria for dismissal for many reasons NSU told Plaintiff they were unable to remove the dismissal status from her transcript even though based on the facts and circumstances Plaintiff was not dismissed from the program.

143. NSU effectively permanently listed her as dismissal despite the fact that under the very guidelines that she was accepted under would not have warranted a dismissal.

144. On or about November 11, 2022, Plaintiff was told via email by Dr. Margo Kregar that "The option to look at the OTD program is there but it is at a higher rigor than the current program. I believe an OTA program would be a great option. You could always look at a

bridging program to eventually be an OT if you wanted, but I know you want more interaction with clients which is sometimes more prevalent in OT. The issue in writing you a letter to OTA school is in handling FERPA. I can't talk about your struggles and perseverance or why you would be better in an OTA verse OT...."

145.     Dr. Margo Kregar also told Plaintiff that when it comes to a letter from the dean that "...Most Deans do not know the students in the various programs enough to write a letter of recommendation."

146.     On or about December 2, 2022, Dr. Margo Kreger stated in an email to Plaintiff that the reason for dismissal was because Plaintiff "...could not complete it in the timeframe. Graduation date would have been 12/31/2023..."

147.     On or about December 22, 2022, after playing "phone tag" with Plaintiff for a few months, Plaintiff provided Samantha Gehrlich, who works under Benjamin Johnson, with her story and tried to get in contact with the Dean, and Samantha Gehrlich connected Plaintiff with Debra Tomkinson.

148.     Benjamin Johnson is the Dean of Students at NSU and is tasked with training and supervising Samantha Gehrlich.

149.     Benjamin Johnson is based on NSU policy response for academic accommodation appeals and on information and belief he rejects over 90% of student accommodation appeals.

150.     On or about January 3, 2023, Plaintiff emailed Samantha Gehrlich requesting to talk and stating how she was told she had "...to share my personal information with the faculty, like mental health, etc...." and stated that it was "...later used against me in my dismissal..." before asking if that is a "...form of discrimination?"

151.     Samantha Gehrlich responded via email once asking if Plaintiff had time to discuss which Plaintiff promptly provided available time and Samantha Gehrlich never responded back.

152.     On or about January 23, 2023, Plaintiff said in an email to Samantha Gehrlich: "I have been treated very poorly by the faculty at Nova and that program in particular which is why I want to speak to the Dean because I do not feel like this is how things should have been handled...I was open and honest about my struggles with mental health and that was used against me. I'm now being told it's my fault that I didn't reach out for resources with my medical problems as well but I had no idea I even could. I should have had resources better offered to me, and should not have been discriminated against based on my mental health. If

student affairs also can't help me that's fine but I don't know where else to turn, it's coming to the point that I might seek legal advice. I'll reach out to the director one more time, but when a student is suicidal and pleading for help a school shouldn't turn their back and dismiss them, and treat them like they are unfit because they are struggling."

153. On or about January 23, 2023, Dr. Terry Morrow Nelson of NSU sent an email to Plaintiff stating that she spoke with Dr. Margo Kreger and that she wanted to speak with Plaintiff.

154. During the phone call between Dr. Terry Morrow Nelson and Plaintiff she told Plaintiff to "move on" and to stop dwelling on it and that this was essentially all Plaintiff's fault.

155. On or about April 17, 2023, Plaintiff was informed by a Senior Admission Counselor at Creighton University that her MOT dismissal will be a major obstacle to overcome.

156. After Plaintiff's wrongful dismissal NSU ad hoc changed the requirements for graduation in the 2022-2023 course catalog, which didn't come out until well after the wrongful acts were committed from a minimum grade of 78 percent in each course to a minimum grade of C+ in each OCT course.

157. This post-hac change was done in order to attempt to support the decision NSU made after Plaintiff informed them of this issue in her appeal.

158. Additionally, Plaintiff took out Title IV federal student loans for attendance. Upon separation from the program, NSU-KPCOM was required to provide exit counseling (including repayment obligations and borrower options).

159. NSU failed and continues to fail to provide Plaintiff the required exit counseling.

160. After Plaintiff's wrongful dismissal NSU conspired to change the requirements for graduation in the 2022-2023 course catalog, which didn't come out until well after the wrongful acts were committed from a minimum grade of 78 percent in each course to a minimum grade of C+ in each OCT course.

**Count I – Section 504 of the Rehabilitation Act (Disability Discrimination / Failure to Accommodate)**

161. Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

162. At all material times, Plaintiff was an otherwise qualified individual with disabilities, including documented psychological/psychiatric disabilities and autoimmune-related impairments, and was otherwise qualified to participate in Defendant's Master of Occupational Therapy program with reasonable accommodations.

163. Defendant receives federal financial assistance and was therefore subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

164. Defendant had actual knowledge of Plaintiff's disabilities and disability-related limitations. Plaintiff disclosed her mental-health and autoimmune-related struggles to faculty and administration, met with her advisor regarding accommodations, and on March 9, 2022, formally requested accommodations through the Office of Student Disability Services, including private testing, additional testing time, additional time on assignments, tutoring, and a Zoom attendance option. Plaintiff also provided supporting documentation from her treating therapist requesting, among other things, additional time for assignments and test taking in a calmer and private space.

165. After delay, Defendant approved accommodations for Plaintiff, including extended time for quizzes and exams at 1.5x and testing in a distraction-reduced setting, and designated Dr. Paula Lowrey as Plaintiff's ADA contact for implementation. Defendant, through officials with authority to address accommodation issues, approved those accommodations and circulated them to Plaintiff's faculty.

166. Despite that knowledge and approval, Defendant failed to timely and effectively implement Plaintiff's accommodations. Before formal approval, Plaintiff was told that no formal accommodations could be provided. After approval, Defendant imposed a burdensome, faculty-by-faculty negotiation process for assignment extensions rather than providing clear and effective access. Most significantly, on June 28, 2022, Plaintiff did not receive her approved accommodations for the OCT 6106 midterm examination, despite faculty notice and actual knowledge of her approved accommodations.

167. By failing to timely and properly implement Plaintiff's approved accommodations, and by providing an accommodation process that was not effective in practice, Defendant denied Plaintiff a meaningful and equal opportunity to participate in and benefit from the program and subjected Plaintiff to discrimination solely by reason of her disability and disability-related limitations.

168. Defendant then acted on the academic consequences of its failure to accommodate Plaintiff by relying on the resulting academic performance in subsequent Committee on Student Progress proceedings and in removing Plaintiff from the program, while disregarding Plaintiff's requests that her accommodations and medical circumstances be taken into account.

169. Defendant's conduct was intentional and/or carried out with deliberate indifference. Officials with authority to review, approve, communicate, and implement accommodations had actual knowledge of Plaintiff's disabilities, her requested accommodations, the accommodations that were approved, and the failure to provide those accommodations, yet failed to timely and adequately correct the problem.

170. As a direct and proximate result of Defendant's conduct, Plaintiff suffered loss of equal educational opportunity, loss of continued participation in the MOT program, tuition and fee losses, out-of-pocket educational expenses, loan-related and other economic harm, delayed entry into her chosen profession, and other compensatory damages recoverable by law. Plaintiff also remains entitled to declaratory and injunctive relief, including appropriate relief directed to the consequences of Defendant's discriminatory failure to accommodate.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, declaratory and injunctive relief, reasonable attorneys' fees and costs as authorized by law, prejudgment and postjudgment interest as allowed by law, and such other relief as the Court deems just and proper.

### Count II – Section 504 Retaliation

171. Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

172. Defendant receives federal financial assistance and is subject to Section 504 of the Rehabilitation Act, which prohibits retaliation against a student for requesting disability accommodations or complaining about disability-based denial of access.

173. Plaintiff engaged in protected activity by requesting academic accommodations through the Office of Student Disability Services on March 9, 2022, providing supporting disability documentation, following up regarding the status and implementation of those accommodations, notifying faculty of her approved accommodations, asserting that her approved accommodations were not being properly provided, and asking that her accommodations and medical circumstances be considered in the academic process. Defendant had actual knowledge of this protected activity through Student Disability Services, Dr. Paula Lowrey, and Plaintiff's faculty and administrators.

174. After Plaintiff engaged in that protected activity, Defendant, through its faculty and administrators, began using Plaintiff's accommodations as a basis for criticism and discipline

rather than support. Faculty invoked Plaintiff's accommodations against her by stating, among other things, "Per your accommodations" and "we need to adhere to the accommodation as it is written." Plaintiff further alleges that, after she did not receive her approved accommodations on the June 28, 2022 OCT 6106 midterm and gave notice of that failure, Defendant escalated its response by raising alleged "professional behavior" concerns and shifting toward discipline.

175.    That escalation culminated in Defendant's August 2022 referral of Plaintiff to the Committee on Student Progress. In that referral and related communications, Defendant expressly relied on accommodation-related matters, including assertions that Plaintiff had "expressed not knowing she had accommodations" and that she did "not communicate as per accommodations when requiring extension on assignments or need to miss class." Defendant then subjected Plaintiff to materially adverse action by pursuing CSP proceedings and dismissing Plaintiff from the MOT program.

176.    A causal connection exists between Plaintiff's protected activity and Defendant's adverse actions. The disciplinary escalation followed Plaintiff's requests for accommodations, her efforts to secure their implementation, and her complaints that the accommodations were not being properly provided. Defendant's own communications and referral materials tied the discipline to Plaintiff's accommodations and her alleged use of them, supporting a reasonable inference that Defendant acted because Plaintiff sought accommodation and pressed for disability-related support and treatment protected by Section 504. Plaintiff was successful for three semesters and only the semester she received accommodations for was apparently not successful.

177.    As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered loss of continued enrollment in the MOT program, loss of educational opportunity, tuition and fee losses, out-of-pocket educational expenses, loan-related and other economic harm, transcript-related harm, delayed entry into her chosen profession, and other damages recoverable by law. Plaintiff also remains entitled to declaratory and injunctive relief as appropriate.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, declaratory and injunctive relief, reasonable attorneys' fees and costs as authorized by law,

prejudgment and postjudgment interest as allowed by law, and such other relief as the Court deems just and proper.

**Count III – ADA Title III (Disability Discrimination / Failure to Make Reasonable Modifications)**

178. Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

179. Defendant owns, leases, or operates a private postgraduate school and place of education, including the occupational therapy programs at issue, and is a place of public accommodation within the meaning of Title III of the ADA.

180. At all material times, Plaintiff was an individual with disabilities, including documented psychological/psychiatric impairments and autoimmune-related impairments, and was otherwise qualified to participate in Defendant's occupational therapy program with reasonable modifications.

181. Defendant had actual knowledge of Plaintiff's disabilities and disability-related limitations. Plaintiff disclosed her disability-related struggles to faculty and administration, provided supporting documentation from her treating therapist, and formally requested accommodations and modifications, including additional testing time, private or calmer testing, additional time on assignments, tutoring, and a Zoom attendance option when disability symptoms interfered with in-person attendance.

182. After delay, Defendant approved certain modifications for Plaintiff, including 1.5x time for quizzes and exams, testing in a distraction-reduced setting, and assignment extensions to be handled between Plaintiff and individual faculty. Defendant designated Dr. Paula Lowrey as Plaintiff's ADA contact and circulated Plaintiff's approved accommodations to faculty.

183. Despite that knowledge and approval, Defendant failed to make reasonable modifications in policies, practices, or procedures necessary to afford Plaintiff full and equal access to the program's services, privileges, and advantages. Among other things, Defendant delayed acting on Plaintiff's request, provided no interim modifications during the review period, told Plaintiff before approval that no formal accommodations could be provided, substituted ad hoc measures instead of approved or requested modifications, required Plaintiff to negotiate assignment extensions on an assignment-by-assignment basis with individual faculty, and

failed to provide Plaintiff's approved testing modifications on the June 28, 2022 OCT 6106 midterm despite faculty notice and actual knowledge of those modifications.

184. Defendant further treated accommodation-related issues as disciplinary or performance issues rather than access issues, including invoking Plaintiff's accommodations and alleged failure to communicate "per accommodations" as part of the criticism and CSP process that resulted in Plaintiff's exclusion from the program.

185. By reason of the foregoing, Defendant denied Plaintiff the full and equal enjoyment of its goods, services, facilities, privileges, advantages, and accommodations, and failed to make reasonable modifications necessary to afford Plaintiff access to Defendant's educational program.

186. As a direct result of Defendant's conduct, Plaintiff was denied equal access to coursework, testing, progression, and continued participation in the program. Plaintiff sought to continue her occupational-therapy education with Defendant, including by asking about continuing or re-entering through the OTD pathway, but remains subject to the continuing effects of the challenged discrimination and exclusion absent prospective relief.

**WHEREFORE**, Plaintiff demands declaratory and injunctive relief requiring Defendant to cease disability discrimination, to provide reasonable modifications sufficient to afford Plaintiff full and equal access to Defendant's occupational-therapy educational programs and related processes, to provide non-discriminatory reconsideration of Plaintiff's dismissal and/or re-entry status, together with reasonable attorneys' fees and costs as authorized by law, and such other equitable relief as the Court deems just and proper.

### Count IV – ADA Retaliation / Interference (42 U.S.C. § 12203)

187. Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

188. Defendant is a private university and place of education subject to Title III of the ADA. At all material times, Plaintiff exercised rights protected by the ADA by disclosing disability-related limitations, requesting academic accommodations and reasonable modifications, providing supporting documentation, following up with Student Disability Services and faculty regarding those accommodations, asserting that approved

accommodations were not being properly implemented, and requesting that her disability-related needs be taken into account in the academic process.

189. Defendant had actual knowledge of Plaintiff's protected activity through Student Disability Services, Dr. Paula Lowrey, Plaintiff's professors, and program administrators. After Plaintiff engaged in that activity, Defendant, through its faculty and administrators, began using Plaintiff's accommodations and accommodation-related issues as a basis for criticism and discipline rather than support. Faculty invoked Plaintiff's accommodations against her by stating, among other things, "Per your accommodations" and "we need to adhere to the accommodation as it is written."

190. Plaintiff further alleges that, after she did not receive her approved accommodations on the June 28, 2022 OCT 6106 midterm and raised accommodation-related concerns, Defendant escalated its response by asserting "professional behavior" issues and pursuing CSP proceedings. In the ensuing referral and related communications, Defendant expressly relied on accommodation-related matters, including assertions that Plaintiff had "expressed not knowing she had accommodations" and that she did "not communicate as per accommodations when requiring extension on assignments or need to miss class."

191. Defendant's conduct constituted retaliation because Defendant subjected Plaintiff to adverse treatment after she exercised ADA-protected rights. Defendant's conduct also constituted interference, coercion, intimidation, and/or threats within the meaning of 42 U.S.C. § 12203 because Defendant used Plaintiff's accommodations, disability-related disclosures, and alleged manner of seeking accommodation-related relief as grounds for criticism, discipline, and exclusion, thereby chilling and burdening Plaintiff's exercise and enjoyment of rights protected by the ADA.

192. Defendant's retaliation and interference culminated in CSP proceedings, dismissal from the MOT program, and continued exclusion from Defendant's occupational-therapy educational pathway, while Plaintiff was still asserting that her accommodations had not been properly provided and should have been considered in the decision-making process.

193. As a direct result of Defendant's retaliation and interference, Plaintiff was denied equal access to Defendant's program and excluded from continued participation. Plaintiff has also alleged an intent to continue her occupational-therapy education with Defendant, including by

pursuing available re-entry or continuation pathways, and remains subject to the ongoing effects of Defendant's retaliatory and interfering conduct absent prospective relief.

**WHEREFORE**, Plaintiff demands declaratory and injunctive relief requiring Defendant to cease retaliating against or interfering with Plaintiff's exercise of ADA rights, to provide non-retaliatory and non-interfering access to reasonable modifications and related academic processes, to provide non-discriminatory reconsideration of Plaintiff's dismissal and/or re-entry status, together with reasonable attorneys' fees and costs as authorized by law, and such other equitable relief as the Court deems just and proper.

**Count V – Breach of Implied-in-Fact / Express Contract**

194. Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

195. A valid contract, express and/or implied in fact, existed between Plaintiff and Defendant arising from Plaintiff's acceptance into Defendant's Master of Occupational Therapy program, Plaintiff's payment of the required acceptance deposit and tuition, Defendant's operative catalogs, handbooks, program policies, and written academic rules in effect at Plaintiff's enrollment and during performance, Plaintiff's signed policy acknowledgment, Defendant's written accommodation-approval documents, and the parties' course of dealing.

196. The material terms of the parties' contract included, among others, the following:

   a. NSU in its handbooks has a section of Statement on Student Rights which states:

      i. "As a community, Nova Southeastern University is committed to furthering scholarship, academic pursuits, and service to our society. All students have an equal opportunity to fulfill their intellectual potential through pursuit of the highest standards of academic excellence.

      ii. Nova Southeastern University students enjoy the right to learn in an environment that is free from discrimination based on the University Equal Opportunity/Nondiscrimination Policy included below.

      iii. It is important that rights of NSU students be embraced by the university community and observed in the spirit of the university's mission. Certain rights and obligations flow from membership in any academic community committed to such goals, including

         1. respect for the equal rights and dignity of others

2. to be treated equally in academic and social settings

3. to live and/or attend classes in a physically safe campus environment

4. the expectation of a positive living/learning environment

5. the ability to initiate a complaint relating to the Code of Student Conduct and Academic Responsibility

6. personal and intellectual freedom, which are fundamental to the idea of a university

7. dedication to the scholarly and educational purposes of the university

8. participation in promoting and ensuring the academic quality and credibility of the institution

9. to provide service to our community and beyond

10. to engage in service opportunities that enhance learning outcomes, both on and off campus"

b. NSU has a University Equal Opportunity/Nondiscrimination Policy which states:

i. "Consistent with all federal and state laws, rules, regulations, and/or local ordinances (e.g., Title VII, Title VI, Title III, Title II, Rehab Act, ADA, Title IX, and the Florida Civil Rights Act), it is the policy of Nova Southeastern University not to engage in any discrimination or harassment against any individuals because of race, color, religion or creed, sex, pregnancy status, national or ethnic origin, nondisqualifying disability, age, ancestry, marital status, sexual orientation, gender, gender identity, military service, veteran status, or political beliefs or affiliations, and to comply with all federal and state nondiscrimination, equal opportunity, and affirmative action laws, orders, and regulations. Any such acts are unacceptable and strictly prohibited by the university

ii. In addition, the law prohibits retaliation against an individual for opposing any practices forbidden under this policy, for bringing a complaint of discrimination or harassment, for assisting someone with such a complaint, for attempting to stop such discrimination or harassment, or for participating in any manner in

any investigation or resolution of a complaint of discrimination or harassment. This nondiscrimination policy applies to NSU's education activities and programs, including admissions; enrollment; scholarships; loan programs; athletics; employment; and access to, participation in, and treatment in all university centers, programs, and activities. NSU admits students of any race, color, religion or creed, sex, pregnancy status, national or ethnic origin, nondisqualifying disability, age, ancestry, marital status, sexual orientation, gender, gender identity, military service, veteran status, or political beliefs or affiliations, to all the rights, privileges, programs, and activities generally accorded or made available to students at NSU, and does not discriminate in the administration of its educational policies, admission policies, scholarship and loan programs, and athletic and other school-administered programs."

c.  "Requirements for Graduation In order to be eligible for a degree from Nova Southeastern University Dr. Pallavi Patel College of Health Care Sciences, each student shall meet the program requirements (following) for his or her specific program. In order to graduate, students must be in good standing. Accordingly, a student who is on academic or disciplinary probation will not be cleared for graduation until the sanction is lifted. Students should consult with their program directors about the process for having any sanctions lifted. Please note that attendance at graduation ceremonies is mandatory for all students in entry-level programs in the Dr. Pallavi Patel College of Health Care Sciences.

  i.  Master of Occupational Therapy
      1.  be of good moral character
      2.  satisfactorily complete the program of study required for the degree (102 semester hours) with a minimum grade of 78 percent in each occupational therapy course and a minimum cumulative GPA of 2.3
      3.  successfully complete the clinical internships within 24 months of completion of didactic courses
      4.  fulfill all financial and library obligations to the university"

d. "Grading Policies and Procedures Grading for Master of Occupational Therapy students is based on a scale of 0–100 percent.

    i.    P or Pass C+ (78 percent) or above for all OCT prefix courses to maintain progress in the academic curriculum. Exception: a grade of C (70 percent) for the anatomy, physiology, and neuroanatomy courses.

    ii.    F or Fail Below a C+ (78 percent) for each OCT prefix and below a C (70 percent) for anatomy, physiology, and neuroanatomy courses"

e. "Master of Occupational Therapy students must maintain at a minimum an overall grade point average of C+, which is 78 percent, to show continuous satisfactory academic performance. See Academic Promotions and Progression. The maximum final grade that M.O.T. students may earn on any didactic course after any remediation will be a C+(E)"

f. "Academic Promotions and Progression

    i.    The Master of Occupational Therapy program follows the policies regarding Academic Standing in the Dr. Pallavi Patel College of Health Care Sciences (PCHCS) section in the handbook. The courses in the Master of Occupational Therapy curriculum have been carefully sequenced to promote optimal learning and skill development. The progress of each student through the curriculum requires continuous satisfactory academic performance. Progression from one term to the next is based on successful completion of the courses offered in prior terms. No student may advance to the second year of study without satisfactorily completing all first-year courses. For first- and second-year courses that are offered only once each year, a student who fails such a course will be required to suspend his or her studies and request a Leave of Absence in writing to the program director and/or department chair, following the Leave of Absence policy stated in the college section of this handbook, for permission to retake the course when it is offered the next academic year. In the second year, students who fail courses that are offered twice a year may be allowed to continue in the program and repeat the course the next time that it is offered, as determined by the recommendation of the CSP and the decision of the department chair. A course failure may significantly extend the length of the

program of study, which is typically 29 months. A course may be repeated only once. Students will be dismissed from the program after two course failures."

g. "Dress Code

    i. The Occupational Therapy Department observes the HPD policy regarding dress code whether on or off campus. In addition, occupational therapy students should wear occupational therapy polo shirts and either khaki or dark-colored trouser-, boot-, or straight-legged pants, when engaged in pre-service or service learning experiences, or during special events, either on or off campus, at the discretion of the department. Slim or tight leg pants, including leggings, and shorts of any length are not acceptable."

197. At all material times, an express and/or implied-in-fact contract existed between Plaintiff and Defendant arising from, among other things, Plaintiff's admission into Defendant's Master of Occupational Therapy program, Plaintiff's payment of the required acceptance deposit and tuition, Defendant's published catalogs, handbooks, policies, and procedures, Plaintiff's execution of required acknowledgments and agreements, and Defendant's written accommodation and Committee on Student Progress communications.

198. Under that contractual relationship, Defendant agreed, inter alia, to govern Plaintiff's academic progression and continued enrollment pursuant to its published policies and procedures; to administer and implement approved disability accommodations through its stated process and designated personnel; and, where the ordinary retake pathway was unavailable due to the sunset or termination of the M.O.T. program, to provide the alternative procedural protections and re-entry-related measures set forth in its written communications to Plaintiff.

199. Plaintiff performed all conditions precedent required of her under the parties' agreement, or such conditions were waived, excused, or rendered impossible by Defendant's conduct. Among other things, Plaintiff accepted admission, paid the required deposit and tuition, signed required forms and acknowledgments, submitted to Defendant the documentation requested in support of her accommodation request, executed the SDS agreement, and otherwise complied with Defendant's academic and administrative requirements.

200. Defendant breached the parties' contract by failing to honor specific written and procedural commitments made to Plaintiff, including by failing to properly carry out and

administer the approved accommodation process after Plaintiff submitted her request and supporting documentation; failing to provide the promised accommodation implementation and testing-protocol process through the designated ADA contact; and failing to carry out the written commitment, following the August 23, 2022 CSP decision, to collaborate with Plaintiff regarding a point person, provide updates concerning developing re-entry opportunities into the O.T.D. program, and discuss Plaintiff's progress toward establishing and implementing a plan for success prior to re-entry.

201.   Defendant further breached the parties' agreement by failing to follow the concrete policies, procedures, representations, and approved accommodations upon which Plaintiff was entitled to rely as part of her enrollment and continued participation in the program.

202.   This claim is not based upon a challenge to Defendant's academic judgment, curriculum, grading discretion, or the quality of instruction. Rather, it is based upon Defendant's failure to perform specific contractual undertakings, including written policies, approved accommodations, and express procedural commitments made to Plaintiff.

203.   As a direct and proximate result of Defendant's breaches, Plaintiff suffered damages, including but not limited to the loss of the benefit of the bargain, loss of the value of tuition, fees, books, and related educational expenditures, interruption and delay of her education and career progression, additional debt and related economic harm, and other damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, consequential damages as permitted by law, costs, prejudgment interest where recoverable, such declaratory and equitable relief as the Court deems appropriate, and such other and further relief as the Court deems just and proper.

**Count VI – Breach of the Implied Covenant of Good Faith and Fair Dealing (Alternative)**

204.   Plaintiff incorporates and re-alleges paragraphs 1-XX as if fully set forth herein, and re-alleges Count V in the alternative to the extent consistent herewith.

205.   In the alternative to Count V, and to the extent an express and/or implied-in-fact contract is found to exist between Plaintiff and Defendant, that contract carried an implied covenant of good faith and fair dealing requiring Defendant to exercise any discretion afforded to it under its policies, procedures, accommodation processes, and progression-related decision-making

honestly, fairly, and in good faith, and not in a manner that would deprive Plaintiff of the benefits of the parties' agreement.

206. Under the parties' contractual relationship, Defendant retained discretion in, among other things, administering and implementing approved accommodations, directing how Plaintiff was to access assignment-related relief, communicating and applying testing protocols, conducting and characterizing the Committee on Student Progress process, and addressing Plaintiff's ability to proceed or re-enter following the determination that the ordinary M.O.T. retake pathway was unavailable due to the sunset or termination of that program.

207. Defendant breached the implied covenant of good faith and fair dealing by exercising such discretion in a manner designed to frustrate, and which did frustrate, Plaintiff's contractual rights and reasonable expectations under the parties' agreement. Among other things, Defendant delayed the accommodation process; imposed an unnecessarily burdensome and unclear structure requiring Plaintiff to negotiate with individual faculty members in order to access assignment-related accommodation relief; failed to ensure that Plaintiff's approved testing accommodations were actually implemented despite notice and approval; and thereafter used accommodation-related matters and Plaintiff's alleged failure to proceed "per accommodations" as a basis for criticism, referral, and adverse action rather than support.

208. Defendant further breached the implied covenant by representing to Plaintiff that the Committee on Student Progress process was intended to be supportive and non-punitive, while using that same process in a manner that resulted in Plaintiff's removal from the program, and by failing to provide the collaborative follow-through, re-entry-related guidance, and procedural assistance set forth in Defendant's written communications after the August 23, 2022 proceedings.

209. By reason of the foregoing, Defendant exercised its contractual discretion in bad faith and in a manner that unfairly frustrated the agreed purpose of the parties' relationship and deprived Plaintiff of the benefit of her bargain, including continued participation in the program subject to Defendant's published rules, procedures, and approved accommodation process.

210. This claim does not challenge Defendant's academic judgment, curriculum, grading discretion, or the quality of instruction. Rather, it is based upon Defendant's bad-faith exercise

of discretion under the parties' contractual relationship and Defendant's unfair frustration of Plaintiff's rights under the same.

211.    As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff suffered damages, including but not limited to loss of the benefit of the bargain, loss of tuition, fees, books, and related educational expenditures, interruption and delay of her education and career progression, additional debt and related economic harm, and other damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, consequential damages as permitted by law, costs, prejudgment interest where recoverable, and such other and further relief as the Court deems just and proper.

## Count VII – Promissory Estoppel (Alternative)

212.    Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein. This Count is pleaded in the alternative.

213.    Defendant, through its Student Disability Services personnel, program leadership, and Committee on Student Progress ("CSP") personnel, made clear and definite promises to Plaintiff in connection with her continued participation in the program, including, among other things, that accommodations were being offered and granted to her; that Dr. Paula Lowrey would be notified of those accommodations, serve as Plaintiff's ADA contact, and explain how the accommodations would be provided and the testing protocol; and that the CSP process was intended to help and support Plaintiff rather than punish her, that her matter did not rise to dismissal, and that the process could assist her in progressing forward in the program.

214.    Defendant made those promises under circumstances in which it reasonably should have expected Plaintiff to rely on them in deciding whether to sign and return the accommodation paperwork, continue seeking relief through Defendant's designated channels, and participate candidly in the CSP process by disclosing sensitive disability-related, medical, and mental-health information in an effort to remain in the program and obtain support.

215.    Plaintiff did, in fact, reasonably and detrimentally rely on those promises. In reliance thereon, Plaintiff executed and returned the accommodation paperwork, continued to pursue implementation through the university personnel identified by Defendant, and participated

candidly in the CSP process under the belief that the process was supportive and not a predicate for dismissal. Contrary to those promises, Defendant did not provide the promised supportive and non-punitive process and did not reliably implement the accommodation process as represented, but instead used those same processes in a manner that culminated in Plaintiff's dismissal.

216.   This Count does not challenge Defendant's academic judgment, grading discretion, curriculum, or the quality of instruction. Rather, it is based on specific promises made by Defendant during the accommodation and CSP processes, Plaintiff's reasonable reliance on those promises, and the resulting detriment when those promises were not honored. Injustice can be avoided only by enforcement of Defendant's promises.

217.   As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages, including but not limited to tuition, fees, books, and related educational expenses; loss and delay of degree progress; additional debt and related economic harm; damage to future educational and professional opportunities; and other consequential damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, consequential damages as permitted by law, costs, prejudgment interest where recoverable, and such other and further relief as the Court deems just and proper.

### Count VIII – Negligent Misrepresentation (Alternative)

218.   Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

219.   Defendant, through its agents, employees, faculty, and administrators, in the course of administering Plaintiff's enrollment, disability-accommodation process, and Committee on Student Progress ("CSP") proceedings, supplied false information, or supplied information without reasonable care as to its truth or accuracy, for the guidance of Plaintiff in connection with her continued participation in the program, use of accommodations, and academic decision-making.

220.   Specifically, Defendant represented to Plaintiff, among other things, that the CSP process was intended to be supportive rather than punitive, that her matter did not rise to the level of dismissal, and that no punishment was being planned. Defendant further represented that accommodations were being offered and granted to Plaintiff, that the appropriate program

officials would be notified, that those officials would explain how the accommodations would be implemented, and that Plaintiff should work through the designated university channels and program leadership to implement those accommodations.

221.   At the time those representations were made, Defendant knew, or in the exercise of reasonable care should have known, that such representations were false, misleading, incomplete, or made without reasonable grounds for believing them to be true. Contrary to those representations, Plaintiff alleges that Defendant had already set in motion or was actively pursuing a course of action that resulted in her dismissal and did not administer the accommodation and CSP processes in the fair, supportive, and non-punitive manner represented to Plaintiff.

222.   Defendant intended, or reasonably should have expected, that Plaintiff would rely upon those representations in deciding whether to continue pursuing accommodations through Defendant's designated procedures, whether to execute and return the accommodation paperwork, and whether to participate candidly in the CSP process by disclosing sensitive personal, medical, and mental-health information.

223.   Plaintiff justifiably relied on Defendant's representations. In reliance thereon, Plaintiff signed and returned the accommodation documentation, continued to seek implementation through the university personnel identified by Defendant, and participated candidly in the CSP process under the belief that the process was intended to support her continued academic progress rather than function as a predicate to dismissal.

224.   As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff was induced to proceed through Defendant's accommodation and CSP processes on false pretenses, was deprived of a fair opportunity to protect her academic status and interests, and was dismissed from the program. Plaintiff thereby suffered damages, including but not limited to tuition and educational expenses, delay and loss of degree progress, damage to future educational and professional opportunities, and other consequential damages in an amount to be proven at trial.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, costs, prejudgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

**Count IX – Unjust Enrichment (Alternative Only)**

225. Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein. This Count is pleaded in the alternative to Plaintiff's contract-based claims.

226. This Count is pleaded in the alternative to Plaintiff's contract-based claims, and only to the extent the Court determines that no enforceable contract governs the subject matter of the benefits conferred upon Defendant.

227. Plaintiff directly conferred substantial benefits upon Defendant, including, without limitation, the $1,000 acceptance and preregistration fee, tuition, mandatory fees, and other monies paid to enroll in and continue attending Defendant's Master of Occupational Therapy program.

228. Defendant knowingly accepted, received, and retained those benefits.

229. Plaintiff conferred those benefits with the reasonable expectation that Defendant would provide her access to the program and would administer her continued enrollment, disability-accommodation process, and progression-related procedures in accordance with Defendant's published policies, approved accommodations, and specific representations made to Plaintiff.

230. Under the circumstances alleged herein, it would be inequitable and unjust for Defendant to retain those benefits without restitution. After accepting and retaining Plaintiff's payments, Defendant failed to timely and properly administer Plaintiff's accommodation request, failed to ensure implementation of approved accommodations, used accommodation-related issues against Plaintiff rather than as support, dismissed Plaintiff from the program, and failed to provide the contemplated follow-through concerning re-entry and related academic guidance after acknowledging that the ordinary M.O.T. retake pathway was unavailable because the program had been sunset or terminated.

231. This Count does not challenge academic judgment or the quality of instruction. Rather, Plaintiff seeks restitution of monies Defendant retained under circumstances in which Defendant did not equitably provide the administrative, accommodation-related, and procedural benefits for which Plaintiff paid.

232. As a direct and proximate result of Defendant's conduct, Defendant has been unjustly enriched at Plaintiff's expense, and Plaintiff has suffered damages in an amount to be proven

at trial, including restitution of the acceptance fee, tuition, mandatory fees, and other monies paid directly to Defendant that, in equity and good conscience, should be returned.

**WHEREFORE**, Plaintiff demands judgment against Defendant for restitution, disgorgement, prejudgment interest as allowed by law, costs, and such other and further relief as the Court deems just and proper.

### Count X – Negligent Supervision

233.    Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

234.    At all material times, Defendant undertook and controlled the supervision of its Student Disability Services personnel, program director, faculty, and Committee on Student Progress ("CSP") personnel responsible for receiving disability-related information, approving and implementing academic accommodations, and handling progression and dismissal-related proceedings for Occupational Therapy students.

235.    Before the conduct complained of herein, NSU had actual knowledge that Plaintiff had disclosed disability-related limitations and requested academic accommodations; that Plaintiff's therapist provided a March 8, 2022 letter to Dr. Paula Lowrey requesting accommodations including additional time and calmer/private test-taking conditions; that Plaintiff formally requested accommodations on March 9, 2022; that NSU's Student Disability Services office routed the draft accommodation memorandum to the Occupational Therapy program director because the program director "knows the student and context best"; that Dr. Lowrey reviewed and approved the draft accommodation memorandum on April 18, 2022; that NSU designated Dr. Lowrey as Plaintiff's ADA contact to explain implementation and testing protocol; and that Dr. Lowrey thereafter acknowledged receipt of Plaintiff's signed accommodation agreement.

236.    Despite that notice, NSU failed to use reasonable care in supervising the personnel charged with implementing and administering Plaintiff's accommodations and related CSP processes. Among other things, NSU failed to ensure that approved accommodations were actually and consistently implemented through the channels NSU itself established; failed to ensure that faculty and program personnel addressed Plaintiff's disability-related struggles through the accommodation process rather than allowing those same issues to be funneled into disciplinary and CSP proceedings; failed to ensure that CSP personnel and program leadership

used consistent and non-misleading procedures when representing that CSP was supportive and not punitive; and failed to intervene after program personnel had notice that Plaintiff's disability-related issues, accommodation-related struggles, and confidential mental-health disclosures were being used in connection with CSP referrals and dismissal-related recommendations.

237. NSU's negligent supervision is further shown by the fact that, although NSU placed responsibility for accommodation implementation and context-specific review in program leadership, NSU nevertheless allowed Plaintiff's matter to proceed without reasonable supervisory safeguards. NSU allowed program personnel to tell Plaintiff that CSP was intended to help her and that her case did not rise to dismissal, while also permitting the matter to proceed toward dismissal and permitting Dr. Lowrey to state, before the August 2022 hearing process had been completed, that Plaintiff appeared to have to start over in the OTD program. NSU likewise failed to reasonably supervise the handling of Plaintiff's accommodation-related concerns after Plaintiff was told to work through the disability-services and program-director channels created by NSU.

238. It was reasonably foreseeable that, absent reasonable supervision of the employees handling Plaintiff's accommodations, disability disclosures, and CSP proceedings, Plaintiff would lose the benefit of approved accommodations, be subjected to a distorted progression and dismissal process, and suffer academic, financial, and emotional harm.

239. As a direct and proximate result of NSU's negligent supervision, Plaintiff suffered dismissal from the program, loss of tuition, fees, books, and related educational expenditures, additional debt and financial harm, loss of educational and professional opportunities, and other damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, pre-judgment and post-judgment interest as allowed by law, costs, and such other relief as the Court deems just and proper.

## Count XI– Negligent Training

240. Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

241. At all material times, Defendant undertook to provide disability-related accommodations and related academic support through its Office of Student Disability Services, program

leadership, faculty, and testing personnel, and further undertook to administer Committee on Student Progress ("CSP") procedures, progression decisions, and related student-support processes through its employees and agents.

242. By virtue of the foregoing undertakings, and by virtue of the policies, procedures, and accommodation processes NSU implemented and required Plaintiff to use, NSU owed Plaintiff a duty to exercise reasonable care in the training of its employees and agents responsible for reviewing accommodation requests, communicating approved accommodations, implementing testing and classroom accommodations, coordinating with the testing center and program faculty, and handling disability-related issues in connection with CSP, academic progression, and dismissal-related proceedings.

243. NSU breached that duty by failing to adequately train its employees and agents regarding the proper, timely, and consistent implementation of approved accommodations; the respective roles of Student Disability Services, program leadership, faculty, and testing personnel in carrying out those accommodations; the proper handling of disability-related disclosures and accommodation-related communications; and the appropriate treatment of accommodation-related issues in connection with CSP and academic progression proceedings.

244. More specifically, despite Plaintiff's disability disclosures, formal request for accommodations, submission of supporting documentation, approval of accommodations, and designation of a program-level ADA contact for implementation, NSU failed to adequately train the personnel involved so as to ensure that Plaintiff's accommodations would be implemented in a clear, uniform, and effective manner. Instead, the accommodation process was administered inconsistently, confusingly, and in a manner dependent upon the varying responses of individual employees. NSU further failed to adequately train its personnel to distinguish between disability-related limitations, accommodation implementation issues, and matters allegedly warranting discipline, CSP referral, or dismissal.

245. As a direct consequence of NSU's inadequate training, Plaintiff's approved accommodations were not implemented in a reliable and consistent fashion; Plaintiff was subjected to an ad hoc and burdensome accommodation process; Plaintiff did not receive approved accommodations on at least one examination as alleged herein; and accommodation-related issues were later invoked against Plaintiff in faculty communications

and CSP-related proceedings rather than being appropriately addressed through a properly functioning accommodation process.

246.    NSU knew or should have known that, absent adequate training of the personnel responsible for accommodation review, implementation, and disability-related academic decision-making, students such as Plaintiff would be exposed to foreseeable harm, including denial of approved accommodations, improper reliance on disability-related conduct in academic or disciplinary proceedings, and adverse educational consequences.

247.    As a direct and proximate result of NSU's negligent training, Plaintiff suffered loss of the benefit of approved accommodations, adverse academic consequences, loss of continued participation in the program, tuition and fee losses, other educational expenses, loan-related and economic harm, loss of educational and professional opportunity, and other damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, pre-judgment and post-judgment interest as allowed by law, costs, and such other relief as the Court deems just and proper.

## Count XII – Florida Deceptive and Unfair Trade Practices Act (FDUTPA)

248.    Plaintiff incorporates and re-alleges paragraphs 1-160 as if fully set forth herein.

249.    At all material times, Defendant was engaged in trade or commerce by advertising, offering, and providing educational services for payment, including admission to and enrollment in its Master of Occupational Therapy program, collection of the required acceptance and preregistration fee, and collection of tuition and related fees from Plaintiff.

250.    In connection with inducing Plaintiff to enroll, remain enrolled, and continue paying money to Defendant, Defendant published and communicated material, consumer-facing representations and policies, including, among other things, that: (a) its catalogs, handbooks, and program publications accurately reflected the program offered; (b) progression, retention, dismissal, graduation, and tuition and fee policies were documented, published, and made known to students; (c) approved disability accommodations would be administered through Student Disability Services, with a designated program ADA contact to explain implementation and testing protocol; and (d) where the ordinary retake pathway was

unavailable because the M.O.T. program had sunset, Defendant would collaborate with Plaintiff regarding a point person and developing opportunities for re-entry.

251.   Those representations were material and were likely to mislead a reasonable student acting in the same circumstances in deciding whether to pay for, continue in, and rely upon Defendant's educational services.

252.   In practice, Defendant administered Plaintiff's accommodation process in an ad hoc, confusing, and materially different manner from what was represented. Plaintiff requested, among other things, private testing, more time, tutoring, additional time on assignments, and Zoom attendance support. Her therapist likewise requested tutoring, additional time, and testing in a calmer and private space. Defendant instead approved a materially narrower and burdensome accommodation structure, required Plaintiff to negotiate assignment relief individually with faculty, failed to provide clear and consistent implementation, and failed to implement approved testing accommodations in a reliable manner. Defendant then used that same accommodation process and rigid application of course-failure policy against Plaintiff in connection with her dismissal.

253.   Defendant further represented, in connection with Plaintiff's dismissal, that because the M.O.T. program had sunset and the ordinary retake pathway was unavailable, Defendant would collaborate with Plaintiff regarding a point person and opportunities for re-entry; however, Plaintiff was dismissed after paying substantial sums to Defendant and, as alleged herein, did not receive the fair, clear, and consistent benefit of the published progression and accommodation framework for which she had paid.

254.   Defendant's conduct, as alleged herein, constituted deceptive acts or unfair practices in the conduct of trade or commerce in violation of section 501.204, Florida Statutes.

255.   As a direct and proximate result of Defendant's deceptive and unfair acts and practices, Plaintiff suffered actual damages, including the $1,000 acceptance and preregistration fee, tuition, mandatory fees, and other out-of-pocket educational expenses paid for services that were not provided in the manner represented. Plaintiff seeks only those actual damages recoverable under FDUTPA, together with attorneys' fees and costs as authorized by law.

**WHEREFORE**, Plaintiff demands judgment against Defendant for actual damages recoverable under FDUTPA, attorneys' fees and costs pursuant to statute, prejudgment interest where allowed, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in Plaintiff's favor and against Defendant, and award the following relief, to the extent available and recoverable under the respective causes of action:

A. Compensatory damages in an amount to be proven at trial, including but not limited to tuition and fees, out-of-pocket educational costs, loan consequences, consequential economic loss, lost income opportunity, and loss of earning capacity;

B.  Declaratory and injunctive relief, where available, including such relief as is pleaded in the respective counts;

C. Reasonable attorneys' fees, where authorized by statute, contract, or other applicable law;

D. Taxable costs of this action, as allowed by law;

E. Pre-judgment and post-judgment interest, as allowed by law; and

F. Punitive damages, only upon leave of Court and amendment pursuant to section 768.72, Florida Statutes, and only as to those causes of action for which such damages are legally available; and

G. Such other and further relief, at law or in equity, as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands trial by jury on all issues so triable.

Dated: April 20, 2026

Respectfully submitted,

/s/ Zachary Gaynor

Zachary Gaynor, Esq.

Florida Bar No.: 125534
https://FLeducationlawyer.com/
Phone number: 561-308-9119
Primary Email: Zacharysgaynor@gmail.com
8903 Glades Rd
Ste A8 #2322
Boca Raton, FL 33434
Attorney for Plaintiff

# Exhibit A

May 2021 NSU website excerpt for M.O.T. Program

## Coronavirus (COVID-19) Updates: Get the Latest Information

The Wayback Machine - https://web.archive.org/web/20210506150035/https://healthsciences.nova.edu/ot/mot/i...

# DEPARTMENT OF OCCUPATIONAL THERAPY

NSU Home      PCHCS Home      Department of Occupational Therapy      MOT



*"I chose to get my Master's in OT at NSU because I saw value in the curriculum and learning experiences, knowing that it would prepare me to be a well-rounded clinician that could also advocate for my clients and profession."*

**Douglene Jackson, Ph.D., OTR/L, LMT, ATP (M.O.T. '02)**
Assessment Consultant. Western Psychological Services
Occupational Therapy Coordinator for Leadership in Education and Neurodevelopmental
Disabilities Program (LEND) at University of Miami
President of FOTA (July 2019 - June 2021)

OOO

# Occupational Therapy (MOT)

## REQUEST / APPLY NOW

To receive more information about NSU occupational therapy programs or to apply now, use one of the options below.

### REQUEST INFORMATION

### APPLY NOW

## OUR BROCHURE



**(COVID-19) Updates: Get the Latest Information**

Learn about our programs, curriculum, tuition and fees, and more. View our brochure

# About Program

The faculty and students of Nova Southeastern University's (NSU) Occupational Therapy Department thank you for the opportunity to inform you about occupational therapy and how students are prepared with the knowledge, skills and value of lifelong learning to practice occupational therapy in customary and innovative ways within an ever-changing world.

NSU's entry-level Master of Occupational Therapy in Fort Lauderdale is accredited by the Accreditation Council for Occupational Therapy Education (ACOTE) of the American Occupational Therapy Association (AOTA).

Visit our Program Using a Back Stage Pass.

**Watch our students share their perspectives.**

## A Day in the Life of a NSU OT Student



See more on **INSTAGRAM** at **https://www.instagram.com/nsu.mot/**

Occupational therapy is a health profession created over 90 years ago to help people of all ages help themselves participate in meaningful activities (occupations), to take care of themselves, be productive, learn, play and interact with others to the best of their abilities. Therefore, the curriculum, classes, labs and internships are based on the belief that doing occupation is how people stay healthy, create their identity, participate in life and feel good about themselves.

When you attend NSU's Occupational Therapy programs, you will gain knowledge to:

**Coronavirus (COVID-19) Updates: Get the Latest Information**

- integrate knowledge from the arts and sciences
- assess and treat in a way that match a client's needs and goals
- promote health and well-being by helping people do occupation
- lead your colleagues and the public to understand how occupation impacts health and
- practice in various settings with people across the lifespan, with or without a disability or illness.

With this knowledge, graduates from NSU's Occupational Therapy programs become exceptionally keen observers, active listeners, creative strategists, critical thinkers, resourceful leaders and practical educators who help people set and meet goals, overcome challenges and thrive in the face of adversity. Students who enter the MOT program are expected to follow the minimal technical standards described in the "Essential Functions Policy for Admission, Retention, and Graduation".

The faculty and staff at NSU look forward to the opportunity to prepare you for a dynamic, diverse and rewarding career.

M.O.T. Program Outcomes/Graduation Rates

Professional Licensure Disclosure

© 2021 Nova Southeastern University | 3301 College Avenue, Fort Lauderdale, Florida 33314-7796 | 800-541-6682
Contact Us | Using Our Site | Privacy Policy | GDPR Privacy Notice | ADA Policy

# Exhibit B

August 2021 NSU website excerpt for M.O.T. Program

The Wayback Machine - https://web.archive.org/web/20210801125014/https://healthsciences.nova.edu/ot/mot/i...

# DEPARTMENT OF OCCUPATIONAL THERAPY

NSU Home      PCHCS Home      Department of Occupational Therapy      MOT

"I chose to get my Master's in OT at NSU because I saw value in the curriculum and learning experiences, knowing that it would prepare me to be a well-rounded clinician that could also advocate for my clients and profession."

**Douglene Jackson, Ph.D., OTR/L, LMT, ATP (M.O.T. '02)**
Assessment Consultant, Western Psychological Services
Occupational Therapy Coordinator for Leadership in Education and Neurodevelopmental
Disabilities Program (LEND) at University of Miami
President of FOTA (July 2019 - June 2021)

O O O

# Occupational Therapy (MOT)

## REQUEST / APPLY NOW

To receive more information about NSU occupational therapy programs or to apply now, use one of the options below.

### REQUEST INFORMATION

### APPLY NOW

## OUR BROCHURE



Learn about our programs, curriculum, tuition and fees, and more. <u>View our brochure</u>

# About Program

The faculty and students of Nova Southeastern University's (NSU) Occupational Therapy Department thank you for the opportunity to inform you about occupational therapy and how students are prepared with the knowledge, skills and value of lifelong learning to practice occupational therapy in customary and innovative ways within an ever-changing world.

NSU's entry-level Master of Occupational Therapy in Fort Lauderdale is accredited by the <u>Accreditation Council for Occupational Therapy Education (ACOTE)</u> of the American Occupational Therapy Association (AOTA).

**NSU's Master of Occupational Therapy (M.O.T.) program is transitioning to a Doctor of Occupational Therapy (O.T.D.) program and is no longer accepting new applicants. Current M.O.T. students may still review relevant information.**

**Watch our students share their perspectives.**

A Day in the Life of a
NSU OT Student



SOUTH FLORIDA: DIVERSITY

**See more on INSTAGRAM at <u>https://www.instagram.com/nsu.mot/</u>**

Occupational therapy is a health profession created over 90 years ago to help people of all ages help themselves participate in meaningful activities (occupations), to take care of themselves, be productive, learn, play and interact with others to the best of their abilities. Therefore, the curriculum, classes, labs and

internships are based on the belief that doing occupation is how people stay healthy, create their identity, participate in life and feel good about themselves.

When you attend NSU's Occupational Therapy programs, you will gain knowledge to:

- integrate knowledge from the arts and sciences
- assess and treat in a way that match a client's needs and goals
- promote health and well-being by helping people do occupation
- lead your colleagues and the public to understand how occupation impacts health and
- interact and participate in experiences consisting of varying degrees of simulation, client interaction, and student-led learning opportunities spanning Mental Health, Adult, and Pediatric practice areas

With this knowledge, graduates from NSU's Occupational Therapy programs become exceptionally keen observers, active listeners, creative strategists, critical thinkers, resourceful leaders and practical educators who help people set and meet goals, overcome challenges and thrive in the face of adversity. Students who enter the MOT program are expected to follow the minimal technical standards described in the "Essential Functions Policy for Admission, Retention, and Graduation".

The faculty and staff at NSU look forward to the opportunity to prepare you for a dynamic, diverse and rewarding career.

M.O.T. Program Outcomes/Graduation Rates

Professional Licensure Disclosure

© 2021 Nova Southeastern University | 3301 College Avenue, Fort Lauderdale, Florida 33314-7796 | 800-541-6682
Contact Us | Using Our Site | Privacy Policy | GDPR Privacy Notice | ADA Policy

IMPORTANT

1. A lawsuit has been filed against you.

2. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. If you choose to file a written response yourself, you may either file the response electronically by using the Florida Courts E-filing Portal (MyFLCourtAccess.com) or by filing the written response with the clerk of court.

3. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case.

4. If you do not file your response on time, you may lose the case, and your wages, money, and property may be taken without further warning from the court. There may be other legal requirements.

5. You may want to call an attorney right away. If you do not know an attorney, you can contact the Lawyer Referral Service listed on The Florida Bar's website (floridabar.org). If you cannot afford a lawyer, you may be eligible for free legal aid. You can locate legal aid programs by searching for "legal aid" on The Florida Bar's website.

6. If you file your written response directly with the clerk of court, you must also send a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

7. You must include an e-mail address in your written response, unless the clerk excuses you from electronic service under Florida Rule of General Practice and Judicial Administration 2.516. A party not represented by April 1, 2026 Florida Rules of Civil Procedure 213 an attorney may be excused from e-mail service by filing Florida Rule of General Practice and Judicial Administration form 2.601 with the clerk. If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact [identify applicable court personnel by name, address, and telephone number] at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.