**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**CASE NO. 0:26-cv-61429-EA/Augustin-Birch**

SAVANNAH WILKES,

Plaintiff,

v.

NOVA SOUTHEASTERN UNIVERSITY, INC.,

Defendant.
_______________________________________/

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Savannah Wilkes ("Plaintiff" or "Ms. Wilkes"), sues Defendant Nova Southeastern University, Inc. ("NSU" or "Defendant"), and alleges as follows. Plaintiff files this First Amended Complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B), within twenty-one days after service of Defendant's Rule 12(b)(6) motion [D.E. 3].

## NATURE OF THE ACTION

1. This is a disability-discrimination action, with related state-law claims, arising from NSU's administration of its own published academic, accommodation, and progression policies as applied to a graduate student with documented disabilities. The claims concern whether NSU followed its written rules and honored its equal-access obligations—not the substance of any academic or grading judgment.
2. In OCT 6106, OT Practice for Mental Health & Wellness, NSU's own Canvas gradebook recorded Ms. Wilkes's coursework at 836 of 1,000 total points—a course total of 83.6%. NSU's published catalog required a minimum grade of 78 percent in each OCT course. NSU nonetheless entered a grade of "F" for OCT 6106 on Ms. Wilkes's official transcript and dismissed her, invoking a published rule providing that "[s]tudents will be dismissed from the program after two course failures." Under NSU's published standard, Ms. Wilkes had no qualifying course failure; even crediting the "F" NSU itself recorded, she had one recorded course failure—not the two its published rule required.

3. That dismissal followed the only academic term in which Ms. Wilkes had for a substantial amount of time approved accommodations, and asked that those accommodations be honored. During that term, NSU approved testing accommodations, circulated them to her faculty, and then failed to provide them on the OCT 6106 midterm examination. NSU thereafter treated the consequences of its own failure to accommodate as grounds for discipline, referred Ms. Wilkes to the Committee on Student Progress, and removed her from the program—expressly invoking her accommodations and accommodation-related conduct in doing so.
4. Plaintiff asserts claims under Section 504 of the Rehabilitation Act and Title III of the Americans with Disabilities Act for disability discrimination, failure to accommodate, retaliation, and interference; related state-law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, negligent misrepresentation, unjust enrichment, negligent supervision, negligent training, and violation of the Florida Deceptive and Unfair Trade Practices Act; and a claim for declaratory relief. Plaintiff seeks compensatory damages, declaratory and injunctive relief, restitution, attorneys' fees and costs where authorized, and related relief.

**JURISDICTION AND VENUE**

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law—Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181–12189 and 12203.
6. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state-law claims because they form part of the same case or controversy as the federal claims, all arising from a common nucleus of operative fact: NSU's administration of its accommodation, academic, progression, and dismissal processes as applied to Ms. Wilkes.
7. This Court has jurisdiction to declare the rights and legal relations of the parties under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.
8. This action was removed from the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, on May 13, 2026 [D.E. 1]. Venue is proper under 28 U.S.C. §§ 1391(b) and 1441(a) because NSU resides in this District, a substantial part of the events

giving rise to the claims occurred in this District, and this District embraces the place where the removed action was pending.

9. All conditions precedent to the bringing of this action have been performed, have occurred, or have been waived or excused.

**PARTIES**

10. Plaintiff, Savannah Wilkes, is a natural person over the age of eighteen and a citizen of the State of Colorado.

11. Defendant, Nova Southeastern University, Inc., is a private not-for-profit university organized under the laws of the State of Florida, with its principal place of business at 3300 South University Drive, Fort Lauderdale, Florida 33328.

12. NSU receives federal financial assistance and is therefore subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

13. NSU owns, leases, leases to, or operates a private postgraduate school and place of education and is a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(J).

14. At all material times, NSU acted through its officers, administrators, faculty, employees, agents, and committees, who acted within the course and scope of their employment or agency and with actual, apparent, or implied authority. Where this pleading attributes conduct to NSU, it refers to conduct by such persons acting on NSU's behalf.

**GENERAL FACTUAL ALLEGATIONS**

**A. Admission and NSU's Published Graduation, Grading, and Progression Requirements**

15. On or about March 29, 2021, Ms. Wilkes was accepted into the Master of Occupational Therapy ("M.O.T.") program within NSU's Health Professions Division.

16. Acceptance required payment of a $1,000 nonrefundable acceptance and preregistration fee to reserve Ms. Wilkes's place in the entering class. Ms. Wilkes timely paid that fee and subsequently paid tuition and fees to NSU.

17. NSU's operative 2021–2022 catalog provided, under "Requirements for Graduation," that to be eligible for the M.O.T. degree students shall "have satisfactorily completed the program of study required for the degree (99 semester hours) with a minimum grade of 78 percent in

each OCT course; 75 percent in anatomy, physiology, and neuroanatomy; and a minimum cumulative GPA of 2.3."

18. NSU's grading policy defined a passing grade for each occupational-therapy ("OCT") course as "C+ (78 percent) or above," and defined failure as "Below a C+ (78 percent)."
19. NSU's academic-progression policy provided that "[a] course may be repeated only once" and that "[s]tudents will be dismissed from the program after two course failures." The same policy provided that, "[w]hen applicable, students who fail a course will be required to suspend their studies and request in writing to the program director and/or department chair for permission to retake the course when it is offered the next academic year," and that "[t]here are no course remediations offered in the Department of Occupational Therapy."
20. The 78% minimum-grade requirement and the two-failure dismissal rule were in effect when Ms. Wilkes was accepted, paid her deposit, and enrolled, and they governed her academic progression during her enrollment.
21. Ms. Wilkes's acceptance letter did not state that the M.O.T. program was being terminated or sunset, or that hers was the last cohort to enter the program.
22. On or about May 2021, at orientation, Ms. Wilkes and her cohort were informed for the first time that the M.O.T. program was ending. As of May 6, 2021, NSU's public webpage for the M.O.T. program—as preserved by the Internet Archive's Wayback Machine—contained no disclosure that the program was being discontinued or was no longer accepting applicants.
23. By August 1, 2021—after Ms. Wilkes had accepted admission, paid, and started—NSU's public M.O.T. webpage, as preserved by the Internet Archive's Wayback Machine, had been edited to add the statement: "NSU's Master of Occupational Therapy (M.O.T.) program is transitioning to a Doctor of Occupational Therapy (O.T.D.) program and is no longer accepting new applicants."
24. The discontinuation of the M.O.T. program meant that the ordinary course-retake pathway contemplated by NSU's progression policy would not be available to Ms. Wilkes in the ordinary course if she were recorded as having failed an M.O.T. course.

**B. Ms. Wilkes's Disabilities, Disclosures, and Formal Accommodation Request**

25. Ms. Wilkes has disabilities within the meaning of Section 504 and the ADA, including documented psychological and psychiatric conditions (anxiety, depression, and

attention-related impairments) and an autoimmune condition, each of which substantially limits one or more major life activities, including concentrating, learning, and the operation of major bodily functions.

26. On or about July 26, 2021, in a course assignment for Fieldwork Experiences I taught by Heather Knoeferl, Ms. Wilkes disclosed that she had autoimmune health issues and suffered from anxiety and depression, that she was unable to control these conditions fully, and that she wanted these conditions taken into consideration by the school.
27. Throughout the fall of 2021, Ms. Wilkes disclosed her mental-health struggles to NSU faculty, including in October 2021 communications to faculty members Jamie Fine and Danielle Barber describing depression and the impact of recent losses, including the death by suicide of a peer in the program and deaths in her family.
28. On or about January 22 and February 7, 2022, Ms. Wilkes told faculty that she was working with a school counselor and was managing depression and anxiety, and that she had upcoming appointments with her therapist and psychiatrist.
29. On or about February 18, 2022, Ms. Wilkes met with her academic advisor regarding her mental-health concerns and her desire for accommodations. She disclosed that she took medication, had upcoming medication adjustments because her anxiety and depression were increasing and making it difficult to focus in class, and that her autoimmune condition at times made it difficult to get out of bed. When asked what accommodations would assist her, Ms. Wilkes identified increased time for exams, a separate testing room to reduce distractions, and blank paper during exams.
30. During the February 18, 2022 meeting, Ms. Wilkes was told that Dr. Paula Lowrey required documentation from a mental-health provider stating that she could continue in the program and what she needed to support her health.
31. On or about March 6 and March 8, 2022, Ms. Wilkes advised faculty that she was struggling to attend class and would obtain a letter from her therapist in support of accommodations, as requested by Dr. Lowrey.
32. On or about March 8, 2022, Ms. Wilkes's treating therapist provided a letter to Dr. Paula Lowrey requesting accommodations for Ms. Wilkes, including additional time and test-taking in a calmer and more private space.

33. On or about March 9, 2022, Ms. Wilkes submitted a formal Academic Accommodation Request Form to NSU's Office of Student Disability Services and provided a release of information listing attention disorders and psychological and psychiatric disabilities. She requested the following accommodations: private testing and additional testing time; additional time on assignments; tutoring; and authorization to attend class via Zoom when her disability (not merely illness or COVID-19) required.

**C. NSU's Delay, Approval, and Circulation of Accommodations**

34. On or about March 23, 2022, approximately two weeks after Ms. Wilkes's request, the Office of Student Disability Services requested additional information and indicated that it had not yet begun evaluating the request. Ms. Wilkes promptly provided the requested information that same day.

35. The Office of Student Disability Services did not confirm receipt and did not provide Ms. Wilkes any interim accommodations during the review period. On or about April 6, 2022, Ms. Wilkes followed up to confirm her information had been received. On or about April 8, 2022, the office responded that review "can take two to four weeks . . . when experiencing a high volume of requests."

36. On or about April 13, 2022, before formal approval, faculty member Danielle Barber advised Ms. Wilkes that "we can't provide you with any formal accommodations" for the final exam but that she could use ear plugs or ear muffs and sit in the back of the room.

37. On or about April 18, 2022, the Office of Student Disability Services, directed by Dr. Jennifer Wilson, Director of Student Disability Services, presented a drafted approved-accommodations memorandum to Dr. Paula Lowrey and asked her to review it; Dr. Lowrey approved it within minutes. That same day, NSU notified Ms. Wilkes of the accommodations being granted, instructed her to read, initial, and return the agreement, and designated Dr. Lowrey as her ADA contact to explain how the accommodations would be provided and the testing protocol

38. Ms. Wilkes's approved examination accommodations were 1.5x the standard time and a reduced-distraction testing setting that could include other accommodated students. The final accommodation memo did not approve private testing, blank paper during examinations, tutoring, or disability-related Zoom attendance, and NSU did not provide a clear denial or

appealable determination as to those requested accommodations before the challenged exam and CSP proceedings.

39. Ms. Wilkes's sole approved classroom accommodation was "[e]xtended time to complete assignments, when necessary and mutually agreed upon by student and faculty member," under which faculty would determine how much additional time would be allowed, with new deadlines "negotiated between student and professor."

40. The approved classroom accommodation required Ms. Wilkes to negotiate extensions on an assignment-by-assignment basis with individual faculty and did not provide clear, consistent, or predictable access when her disability symptoms affected her performance. The approved-accommodations text used standard form language rather than an individualized implementation plan for Ms. Wilkes; it retained a generic "his/her" descriptor.

41. On or about April 26, 2022, Dr. Paula Lowrey circulated Ms. Wilkes's list of approved academic accommodations by email to her faculty and program personnel, including Nardia Aldridge, Vanessa Johnson, Helene Lieberman, Heather Knoeferl, Melissa Schaeffer, Nicole Quint, Elisa Bloch, Danielle Barber, Margo Kreger, and Ricky Davenport.

**D. NSU's Failure to Implement the Approved Accommodations**

42. After approval, NSU did not provide Ms. Wilkes clear or consistent access to her approved accommodations. Rather than implement the approved testing and assignment accommodations through a defined process, NSU left implementation to ad hoc, faculty-by-faculty handling.

43. On or about May 31, 2022, when Ms. Wilkes asked the Office of Student Disability Services about her accommodations, the office directed her to work with the program director.

44. On or about June 28, 2022, Ms. Wilkes sat for the midterm examination in OCT 6106. NSU did not provide either of her approved examination accommodations—the 1.5x time or the reduced-distraction setting—for that midterm. Ms. Wilkes scored 136 of 200 points (68%) on that midterm. The gradebook statistics NSU maintained for the examination reflected a class mean of 174.51; 136 was the lowest score recorded for the class.

45. Both of the faculty members responsible for OCT 6106, Sarah Mbiza and Danielle Barber, had actual notice of Ms. Wilkes's approved examination accommodations before the June 28,

2022 midterm, as the approved accommodations had been circulated to them on April 26, 2022.

46. As a result of NSU's failure to provide her approved examination accommodations, Ms. Wilkes's score on the OCT 6106 midterm was lower than it would have been had the accommodations been provided.

47. Ms. Wilkes provided NSU notice of her approved accommodations both before and after the midterm. NSU did not offer to re-administer the midterm with accommodations, adjust the score, or otherwise cure the failure.

**E. NSU's Use of Ms. Wilkes's Accommodations Against Her and the CSP Referrals**

48. Beginning in late spring 2022, NSU faculty invoked Ms. Wilkes's accommodations as a basis for criticism rather than support. On or about May 31, 2022, Dr. Melissa Schaeffer emailed Ms. Wilkes stating "Per your accommodations," referencing an accommodation Ms. Wilkes had not requested for missing a class session.

49. On or about June 1, 2022, Dr. Jamie Fine emailed Ms. Wilkes stating that "we need to adhere to the accommodation as it is written." Dr. Fine's own course syllabus separately permitted late-assignment exceptions "at the discretion of the professor," a more flexible standard than the one Dr. Fine invoked against Ms. Wilkes's accommodation.

50. On or about June 9, 2022, Dr. Jamie Fine contacted Ms. Wilkes to discuss the process for using her accommodations when she was "not feeling well." Ms. Wilkes was not approved for any accommodation relating to missing class.

51. On or about July 29, 2022, Dr. Danielle Barber emailed Ms. Wilkes—copying Dr. Paula Lowrey and Dr. Margo Kreger—for the first time asserting that, since the midterm examination, Ms. Wilkes had "professional behavior" issues that needed to be discussed and documented.

52. On or about August 1, 2022, Dr. Margo Kreger and Dr. Melissa Schaeffer referred Ms. Wilkes to the Committee on Student Progress ("CSP"), citing an "Academic issue," a "violation of professional or behavioral code of conduct," and an asserted "inability to meet OT essential functions."

53. The August 1, 2022 referral expressly relied on accommodation-related matters. Among the stated reasons, the referral asserted that Ms. Wilkes had "expressed not knowing she had

accommodations" and that she did "not communicate as per accommodations when requiring extension on assignments or need to miss class."

54. Ms. Wilkes was not approved for any accommodation relating to missing class, and she had not used the assignment-extension negotiation framework. Before referring Ms. Wilkes for an asserted inability to meet OT essential functions, NSU did not perform any analysis of whether those functions could be met with appropriate accommodations.

55. On or about August 2, 2022, Dr. Margo Kreger emailed Ms. Wilkes stating that she and Dr. Schaeffer had referred her to CSP "to see if they are able to help you in progressing in your coursework next semester."

56. On or about August 5, 2022, Dr. Heather Knoeferl formally notified Ms. Wilkes of the CSP referral and a hearing set for August 16, 2022.

57. On or about August 7, 2022, in response to Ms. Wilkes's expressed concern, Dr. Heather Knoeferl stated that, although CSP can be a means to evaluate dismissal, Ms. Wilkes's "case does not rise to that level."

58. Ms. Wilkes completed OCT 6106 on or about August 9, 2022, sitting for the final examination, on which she scored 191 of 250 points (76.4%). NSU's Canvas gradebook for OCT 6106 recorded Ms. Wilkes's category totals as 450 of 600 points (75%) on individual assignments and 386 of 400 points (96.5%) on group assignments—836 of 1,000 total points, a course total of 83.6%, above the published 78 percent minimum for OCT courses. Those totals were reflected in NSU's gradebook as maintained on or about August 15, 2022.

59. On or about August 15, 2022, Dr. Sarah Mbiza referred Ms. Wilkes to CSP for asserted "Academic issues" and a "Violation of professional or behavioral code of conduct."

60. On or about August 15, 2022, before any hearing on the second referral and before any dismissal determination, Dr. Paula Lowrey emailed program personnel stating that Ms. Wilkes "is a year 2 student and it appears will have to start over in the OTD," and that "Tamara needs to know and the Dean if she chooses."

61. On or about August 18, 2022, Dr. Heather Knoeferl formally notified Ms. Wilkes of a further CSP hearing set for August 23, 2022, identified as concerning "Academic Issues: Course failure for OCT 6106 OT Practice for Mental Health & Wellness" and a "Violation of professional or behavioral code of conduct: Class attendance."

62. On or about August 22, 2022, Dr. Heather Knoeferl emailed Dr. Tamara Pinchevsky-Font asking how Ms. Wilkes could be enrolled when she allegedly "failed a prerequisite course." Under NSU's published grading standard and NSU's own gradebook, Ms. Wilkes had not failed any course.

**F. The August 2022 Hearings, the Dismissal, and Its Continuing Effects**

63. On or about August 16, 2022, the CSP convened a hearing on the first referral, identified as concerning professional behaviors. The committee included Dr. Terry Morrow Nelson (Student Affairs), Dr. Odoo McCallum, Dr. Thomas Decker, Dr. Melissa Schaeffer, and Dr. Heather Knoeferl.
64. By letter dated August 23, 2022, Dr. Tamara Pinchevsky-Font resolved the professional-behaviors referral by directing Ms. Wilkes to research three time-management strategies, select one for a written action plan, and write a reflection—citing the Student Handbook's "Disciplinary Warning" provision. No suspension or dismissal was imposed on that referral.
65. On or about August 23, 2022, at 11:30 a.m., Ms. Wilkes attended the CSP hearing on the second referral, held via Zoom. NSU's decision letter identified the reason for the referral and meeting as "to address a course failure"—which the letter described as occurring "in the OTD program," although Ms. Wilkes was enrolled in the M.O.T. program. The committee comprised Ms. Krishani Harrinauth (Student Affairs), Dr. Odoo McCallum, Dr. Thomas Decker, and Dr. Heather Knoeferl. During the hearing, Ms. Wilkes informed the committee that she had ADHD and was still working to identify accommodations that suited her needs.
66. During the hearing, Dr. Heather Knoeferl told Ms. Wilkes that Dr. Pinchevsky-Font would make the final decision and would contact her by email and mail within ten days of the hearing.
67. Dr. Heather Knoeferl emailed the CSP report to Dr. Pinchevsky-Font at approximately 3:39 p.m. on August 23, 2022, and Dr. Pinchevsky-Font forwarded it to Ms. Wilkes at approximately 4:46 p.m. that same day—within hours of the hearing.
68. Dr. Pinchevsky-Font's written decision letter, dated August 23, 2022, quoted the Student Handbook's progression policy—including that "[w]hen applicable, students who fail a course will be required to suspend their studies and request in writing to the program director

and/or department chair for permission to retake the course when it is offered the next academic year," that "[a] course may be repeated only once," and that "[s]tudents will be dismissed from the program after two course failures." The letter stated the Department Chair's decision as: "Savannah Wilkes suspends her studies in accordance with the policy." The letter further acknowledged that "there is no prescribed opportunity for a student in the MOT program" to request permission to retake the course "due to the sunset/termination of this MOT program," and provided for a "point person" to advise Ms. Wilkes "should Savannah choose to re-enter in the OTD program."

69. After receiving the CSP results, Ms. Wilkes asked whether she was continuing in the program or being dismissed. Dr. Pinchevsky-Font responded that "Due to our policy on course failure, it's a dismissal."

70. The published rule NSU invoked authorizes dismissal only "after two course failures." Under NSU's published 78 percent standard and NSU's own gradebook, Ms. Wilkes had no qualifying course failure in OCT 6106 or any other course. Even crediting the "F" NSU itself entered for OCT 6106, Ms. Wilkes had a single recorded course failure—not two. NSU has never identified any second course failure.

71. Notwithstanding the 83.6% total recorded in NSU's own gradebook and the written decision that Ms. Wilkes "suspends her studies in accordance with the policy," NSU entered a grade of "F"—zero quality points—for OCT 6106 on Ms. Wilkes's official transcript and recorded the notations "Dismissed from Program" and "Last Standing: Dismissed from Program." No other grade of "F" appears anywhere on the transcript. An official transcript NSU issued on December 31, 2025 continues to bear the "F" and the "Dismissed from Program" designation.

72. When Ms. Wilkes asked why her accommodations and medical circumstances were not discussed at the hearing, Dr. Pinchevsky-Font stated that the "goal of the accommodations that you were granted is for student success." Ms. Wilkes responded that she did not believe her accommodations had been properly provided or taken into consideration.

73. Before Ms. Wilkes requested any accommodation, she had completed three academic terms—Summer 2021, Fall 2021, and Winter 2022—without a failing grade in any course. The term in which she first had approved accommodations in place was the term that resulted in the recorded "failure" and her dismissal. At dismissal, Ms. Wilkes's cumulative grade

point average was 2.69—above the published 2.3 minimum—even with the zero quality points assigned to the recorded "F."

74. On or about September 18, 2022, Ms. Wilkes asked the NSU Registrar's office about the appeal process for an academic dismissal. NSU did not explain the process, and Ms. Wilkes's NSU email account was thereafter locked.

75. On or about October 5 and November 11, 2022, Dr. Margo Kreger advised Ms. Wilkes to consider applying to occupational-therapy-assistant (OTA) programs and stated that the OTD program was at a higher rigor; she also stated that NSU would have difficulty providing a recommendation letter consistent with FERPA.

76. On or about October 31, 2022, NSU told Ms. Wilkes it was unable to remove the "dismissed" status from her transcript. NSU has continued to maintain that designation on Ms. Wilkes's transcript.

77. On or about December 2, 2022, Dr. Margo Kreger stated that the reason for dismissal was that Ms. Wilkes "could not complete it in the timeframe," and referenced a graduation date of December 31, 2023.

78. Through late 2022 and into 2023, Ms. Wilkes sought review through NSU's Office of the Dean of Students and related personnel, recounting that she had been required to share personal mental-health information that was then used against her in her dismissal, and asking whether that constituted discrimination. NSU did not provide Ms. Wilkes a substantive resolution.

79. On or about January 23, 2023, after Ms. Wilkes communicated that she had been treated poorly and was considering legal advice, Dr. Terry Morrow Nelson spoke with Ms. Wilkes by telephone and told her, in substance, to "move on."

80. On or about April 17, 2023, a Senior Admission Counselor at Creighton University informed Ms. Wilkes that her M.O.T. dismissal would be a major obstacle to overcome in seeking admission elsewhere.

81. After Ms. Wilkes's dismissal, NSU's 2022–2023 course catalog—published after the events described above—changed the stated M.O.T. graduation requirement from completion "with a minimum grade of 78 percent in each OCT course; 75 percent in anatomy, physiology, and neuroanatomy" to completion "with a minimum grade of C+ in each OCT course; C in anatomy, physiology, and neuroanatomy."

82. Ms. Wilkes took out Title IV federal student loans to attend NSU. Upon her separation from the program, NSU was required to provide exit counseling addressing repayment obligations and borrower options.
83. As a result of NSU's conduct, Ms. Wilkes lost the benefit of her tuition and fees, incurred additional debt and economic harm, suffered the loss of continued participation in the program, experienced delay and impairment of her education and intended occupational-therapy career, and continues to bear a transcript designation reflecting a "dismissal" that NSU's own published rules did not authorize.

**COUNT I**

***Disability Discrimination and Failure to Accommodate — Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Against NSU)***

84. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 20 and 25 through 83 as though fully set forth herein.
85. At all material times, Ms. Wilkes was an individual with a disability and was otherwise qualified to participate in NSU's M.O.T. program with or without reasonable accommodations. She met the program's published academic standards, including the 83.6% course total recorded in NSU's own gradebook for OCT 6106—above the published 78 percent minimum—and a cumulative grade point average above the published 2.3 minimum.
86. NSU receives federal financial assistance and is subject to Section 504, 29 U.S.C. § 794.
87. NSU had actual knowledge of Ms. Wilkes's disabilities and disability-related limitations through her disclosures to faculty and administrators, her February 18, 2022 advisor meeting, her treating therapist's March 8, 2022 letter to Dr. Lowrey, and her formal March 9, 2022 accommodation request.
88. NSU approved reasonable accommodations for Ms. Wilkes—including 1.5x examination time and a reduced-distraction testing setting—designated Dr. Lowrey as her ADA contact, and circulated the approved accommodations to her faculty on April 26, 2022.
89. NSU failed to provide Ms. Wilkes's approved accommodations. Most concretely, on June 28, 2022, NSU did not provide either approved examination accommodation on the OCT 6106 midterm, despite faculty's actual notice; as a result, Ms. Wilkes's score was lower than it would have been. NSU also failed to provide clear and consistent access to the approved

accommodations more generally, and provided no interim accommodations during the review period.

90. By approving accommodations and then failing to implement them, NSU denied Ms. Wilkes meaningful and equal access to its program and its benefits, and subjected her to discrimination on the basis of disability.

91. NSU then relied on the academic and personal consequences of its own failure to accommodate—including the consequences attributed to the under-accommodated midterm—as a basis for the CSP process and Ms. Wilkes's removal from the program, while disregarding her requests that her accommodations and medical circumstances be considered.

92. Separately and in the alternative, NSU entered a grade of "F" for OCT 6106 on Ms. Wilkes's transcript notwithstanding the 83.6% course total in NSU's own gradebook, and dismissed her under a rule reserved for students with two course failures, though under NSU's published standard she had none—and even crediting the recorded "F," she had one. The recorded "failure" was a pretext for exclusion on the basis of disability, as shown by NSU's contemporaneous reliance on Ms. Wilkes's accommodations and disability-related conduct, the sequence of events, and NSU's departure from its own published grading and progression standards.

93. NSU's conduct was intentional or carried out with deliberate indifference. Officials with authority to review, approve, communicate, and implement accommodations had actual knowledge of Ms. Wilkes's disabilities, her approved accommodations, and the failure to provide them, yet failed to act to correct the failure. Ms. Wilkes is therefore entitled to compensatory damages.

94. As a direct and proximate result, Ms. Wilkes suffered loss of equal educational opportunity, loss of continued participation in the program, tuition and fee losses, out-of-pocket and loan-related economic harm, transcript-related harm, delayed entry into her profession, and other compensatory damages recoverable by law.

**WHEREFORE**, Plaintiff demands judgment against NSU for compensatory damages, declaratory and injunctive relief (including relief directed to the consequences of NSU's discriminatory failure to accommodate), reasonable attorneys' fees and costs as authorized by law, prejudgment and postjudgment interest, and such other relief as the Court deems just and proper.

## COUNT II

***Retaliation — Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Against NSU)***

95. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 20 and 25 through 83 as though fully set forth herein.

96. Section 504 prohibits retaliation against a person for requesting disability accommodations or opposing disability-based denial of access.

97. Ms. Wilkes engaged in protected activity by requesting accommodations on March 9, 2022, providing supporting documentation, following up on the status and implementation of her accommodations, notifying faculty of her approved accommodations, asserting that her approved accommodations were not being provided, and asking that her accommodations and medical circumstances be considered in the academic process. NSU had actual knowledge of this activity through Student Disability Services, Dr. Lowrey, and her faculty and administrators.

98. After Ms. Wilkes engaged in protected activity, NSU subjected her to materially adverse action, including the August 2022 CSP referrals, the CSP proceedings, and her dismissal from the program.

99. A causal connection exists between the protected activity and the adverse action. NSU's decisionmakers tied the adverse action to Ms. Wilkes's accommodations and accommodation-related conduct: faculty invoked her accommodations against her ("Per your accommodations"; "we need to adhere to the accommodation as it is written"), and the August 1, 2022 CSP referral expressly faulted her for "express[ing] not knowing she had accommodations" and for failing to "communicate as per accommodations." The escalation followed Ms. Wilkes's requests for accommodation, her efforts to secure implementation, and the under-accommodated June 28, 2022 midterm. The adverse action arose in the term in which Ms. Wilkes first had approved accommodations in place.

100. NSU's stated reasons for the adverse action were pretextual, as shown by NSU's reliance on accommodation-related conduct, its departure from its published grading and progression standards in entering an "F" notwithstanding the 83.6% course total in its own gradebook, and the inconsistency between its "supportive, non-punitive" representations and its conduct.

101. As a direct and proximate result of NSU's retaliation, Ms. Wilkes suffered loss of continued enrollment, loss of educational opportunity, tuition and fee losses, out-of-pocket

and loan-related economic harm, transcript-related harm, delayed entry into her profession, and other damages recoverable by law.

**WHEREFORE**, Plaintiff demands judgment against NSU for compensatory damages, declaratory and injunctive relief, reasonable attorneys' fees and costs as authorized by law, prejudgment and postjudgment interest, and such other relief as the Court deems just and proper.

## COUNT III

***Disability Discrimination and Failure to Make Reasonable Modifications — Title III of the ADA, 42 U.S.C. §§ 12181–12189 (Against NSU)***

102. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 20 and 25 through 83 as though fully set forth herein.

103. NSU owns, leases, or operates a private postgraduate school and place of education and is a place of public accommodation under 42 U.S.C. § 12181(7)(J).

104. At all material times, Ms. Wilkes was an individual with a disability and was otherwise qualified to participate in NSU's occupational-therapy program with reasonable modifications.

105. NSU had actual knowledge of Ms. Wilkes's disabilities and disability-related limitations, as alleged above, and approved modifications including 1.5x examination time and a reduced-distraction testing setting, designating Dr. Lowrey as her ADA contact and circulating the approved modifications to faculty.

106. NSU failed to make reasonable modifications in its policies, practices, and procedures necessary to afford Ms. Wilkes full and equal access. Among other things, NSU delayed acting on her request, provided no interim modifications, told her before approval that no formal accommodations could be provided, required her to negotiate assignment extensions individually with faculty, and failed to provide either approved examination modification on the June 28, 2022 OCT 6106 midterm despite faculty notice.

107. NSU further treated accommodation-related issues as disciplinary or performance issues rather than access issues, invoking Ms. Wilkes's accommodations and her alleged failure to communicate "per accommodations" as part of the CSP process that culminated in her exclusion from the program.

108. The modifications Ms. Wilkes requested and was granted were reasonable and necessary for equal access and would not have fundamentally altered NSU's program; any contention that a modification was unreasonable or would work a fundamental alteration presents a fact-bound question on which NSU bears the burden.

109. By reason of the foregoing, NSU denied Ms. Wilkes the full and equal enjoyment of its services, privileges, advantages, and accommodations and failed to make reasonable modifications necessary to afford her access to its educational program.

110. Ms. Wilkes has standing to seek prospective relief. The "dismissed" designation NSU placed and maintains on her transcript is a present, concrete, and continuing injury: NSU has refused to remove it; an official transcript NSU issued on December 31, 2025 continues to bear it; and a Creighton University admissions counselor advised Ms. Wilkes that the dismissal would be a major obstacle to admission elsewhere. Ms. Wilkes intends to pursue further occupational-therapy education, and the dismissal designation is the obstacle to doing so. Reapplication while that designation stands would be futile, and Ms. Wilkes need not perform a futile gesture to establish standing for injunctive relief correcting NSU's ongoing discrimination.

**WHEREFORE**, Plaintiff demands declaratory and injunctive relief requiring NSU to cease disability discrimination, to make reasonable modifications sufficient to afford Plaintiff full and equal access to its educational programs and related processes, and to provide non-discriminatory reconsideration of Plaintiff's dismissal designation and re-entry status, together with reasonable attorneys' fees and costs as authorized by law and such other equitable relief as the Court deems just and proper.

## COUNT IV

***Retaliation and Interference — ADA, 42 U.S.C. § 12203 (Against NSU)***

111. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 20 and 25 through 83 as though fully set forth herein.

112. The ADA prohibits retaliation against any individual because that individual has exercised rights protected by the Act, including requesting reasonable modifications and opposing disability-based denial of access, 42 U.S.C. § 12203(a).

113. Ms. Wilkes exercised rights protected by the ADA by requesting reasonable modifications, providing documentation, following up regarding implementation, asserting that her approved modifications were not being provided, and requesting that her disability-related needs be considered. NSU had actual knowledge of that activity.

114. After Ms. Wilkes exercised her ADA rights, NSU subjected her to materially adverse action—CSP referral, CSP proceedings, and dismissal—and did so because of her protected activity, as shown by NSU's contemporaneous reliance on her accommodations and accommodation-related conduct, the timing relative to her requests and the under-accommodated midterm, and NSU's departure from its published academic standards.

115. As a direct and proximate result of NSU's retaliation, Ms. Wilkes was denied equal access to NSU's program and excluded from continued participation.

116. Ms. Wilkes remains subject to the ongoing effects of NSU's retaliatory conduct, including the "dismissed" designation NSU maintains on her transcript and has refused to remove, which is a present and continuing injury and which, absent prospective relief, will continue to impair her ability to pursue further occupational-therapy education, including re-entry or continuation through the OTD pathway.

**WHEREFORE**, Plaintiff demands declaratory and injunctive relief requiring NSU to cease retaliating against or interfering with Plaintiff's exercise of ADA rights, to provide non-retaliatory access to reasonable modifications and related academic processes, and to provide non-discriminatory reconsideration of Plaintiff's dismissal designation and re-entry status, together with reasonable attorneys' fees and costs as authorized by law and such other equitable relief as the Court deems just and proper.

## COUNT V

***Breach of Express and/or Implied-in-Fact Contract (Against NSU)***

117. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 24 and 42 through 83 as though fully set forth herein.

118. Under Florida law, the relationship between a student and a private university is contractual, and its terms may be derived from the university's published catalog and student handbook in effect at the time of enrollment.

119. A valid contract, express and/or implied in fact, existed between Ms. Wilkes and NSU, arising from her admission, her payment of the required acceptance deposit and tuition, and NSU's catalog and handbook in effect at her enrollment.

120. The contract included the following definite, measurable terms published by NSU and applicable to Ms. Wilkes: (a) that a passing grade in each occupational-therapy course was "C+ (78 percent) or above" and that failure was "Below a C+ (78 percent)"; and (b) that, "[w]hen applicable, students who fail a course will be required to suspend their studies and request in writing to the program director and/or department chair for permission to retake the course when it is offered the next academic year," that "[a] course may be repeated only once," and that "[s]tudents will be dismissed from the program after two course failures."

121. These are specific and objective contractual terms—a measurable grade threshold and an objective dismissal trigger—not aspirational policy statements. This claim does not rest on NSU's general Statement on Student Rights or its general nondiscrimination policy.

122. Ms. Wilkes performed all conditions precedent required of her, or such conditions were waived, excused, or rendered impossible by NSU's conduct. She accepted admission, paid the required deposit and tuition, and satisfied the published academic standard: NSU's own gradebook for OCT 6106 recorded a course total of 83.6%, above the published 78 percent threshold.

123. NSU breached these contractual terms in at least two independent respects: (a) NSU recorded a "failure"—entering a grade of "F" on Ms. Wilkes's official transcript—for a course in which NSU's own gradebook recorded a total of 83.6%, above the published 78 percent passing threshold; and (b) independently, and even crediting the recorded "F," NSU dismissed Ms. Wilkes under the two-failure rule although she had at most one recorded course failure—and, under the published standard, none—rather than affording the published single-failure suspension-and-retake pathway that NSU's own August 23, 2022 decision letter invoked.

124. This claim is independent of any statutory duty under the ADA or Section 504. NSU's published 78% grading threshold and two-failure progression rule apply to every student regardless of disability, and Ms. Wilkes seeks to enforce those academic terms as written. This claim does not challenge NSU's academic judgment, curriculum, grading discretion, or quality of instruction.

125. As a direct and proximate result of NSU's breach, Ms. Wilkes suffered damages, including loss of the benefit of the bargain, loss of the value of tuition, fees, and related educational expenditures, interruption and delay of her education and career progression, additional debt and related economic harm, and other damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against NSU for compensatory and consequential damages as permitted by law, costs, prejudgment interest where recoverable, such declaratory and equitable relief as the Court deems appropriate, and such other relief as the Court deems just and proper.

**COUNT VI**

***Breach of the Implied Covenant of Good Faith and Fair Dealing — Pleaded in the Alternative to and as Part of Count V (Against NSU)***

126. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 24 and 42 through 83, and re-alleges the contractual terms identified in paragraphs 120 and 121, as though fully set forth herein.

127. This Count is pleaded in the alternative to, and as a part of, Count V. It depends upon and attaches to the same express contractual terms identified in Count V—the 78% grading standard and the suspension, retake, and two-failure progression and dismissal framework—and the broader progression and dismissal framework of which they are a part. It is not asserted as a freestanding cause of action independent of that contract.

128. Every contract in Florida includes an implied covenant of good faith and fair dealing that governs the manner in which a party exercises discretion conferred by the contract's express terms.

129. NSU's academic-progression framework conferred discretion on NSU in administering course failures, retakes, and dismissal—including, in the second year, whether a student who failed a course offered more than once "may be allowed to continue in the program," as "determined by the recommendation of the CSP and the decision of the department chair."

130. NSU breached the implied covenant by exercising that contractual discretion in bad faith and in a manner that frustrated Ms. Wilkes's contractual rights and reasonable expectations—namely, by treating a course in which its own gradebook recorded a passing 83.6% total as a "failure" to trigger the progression and dismissal machinery, by

characterizing the CSP process as supportive and non-punitive while using it to remove her, by issuing a written decision that Ms. Wilkes "suspends her studies in accordance with the policy" while recording a dismissal on her transcript, and by applying the two-failure dismissal rule to a student with no qualifying failure.

131. This Count does not challenge NSU's academic judgment, curriculum, grading discretion, or quality of instruction; it concerns NSU's bad-faith exercise of the discretion afforded by the express contractual terms in Count V.

132. As a direct and proximate result, Ms. Wilkes suffered the damages described in Count V.

**WHEREFORE**, Plaintiff demands judgment against NSU for compensatory and consequential damages as permitted by law, costs, prejudgment interest where recoverable, and such other relief as the Court deems just and proper. In the alternative, Plaintiff requests that the allegations of this Count be considered as part of the breach alleged in Count V.

## COUNT VII

***Promissory Estoppel — Pleaded in the Alternative (Against NSU)***

133. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 14 and 25 through 83 as though fully set forth herein.

134. This Count is pleaded in the alternative to Plaintiff's contract-based claims, to the extent the Court determines no enforceable contract governs the subject matter of the promises alleged.

135. NSU made clear and definite promises to Ms. Wilkes, including: (a) that her accommodations were being offered and granted and that Dr. Lowrey would serve as her ADA contact and explain how the accommodations would be provided and the testing protocol; and (b) that the CSP process was intended to help and support her, that her matter "does not rise to" the level of dismissal, and that the process could assist her in progressing in the program.

136. NSU should reasonably have expected those promises to induce Ms. Wilkes's reliance.

137. Ms. Wilkes reasonably and detrimentally relied on those promises in ways distinct from any pre-existing course of conduct. In specific reliance on NSU's representation that the CSP process was supportive and that her matter did not rise to dismissal, Ms. Wilkes participated candidly in the CSP process and continued to disclose sensitive disability-related, medical,

and mental-health information within that process, and she forbore from taking other steps to protect her academic standing—such as seeking a contemporaneous leave of absence, pursuing immediate external review, or otherwise guarding against an adverse outcome she had been assured was not in prospect.

138. Contrary to NSU's promises, NSU did not provide the supportive, non-punitive process represented and did not reliably implement the accommodations as represented, but instead used those processes in a manner that culminated in Ms. Wilkes's dismissal. Injustice can be avoided only by enforcement of NSU's promises.

139. This Count does not challenge NSU's academic judgment, grading discretion, curriculum, or quality of instruction.

140. As a direct and proximate result, Ms. Wilkes suffered damages, including tuition, fees, and related educational expenses, loss and delay of degree progress, additional debt and related economic harm, damage to future educational and professional opportunities, and other consequential damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against NSU for compensatory and consequential damages as permitted by law, costs, prejudgment interest where recoverable, and such other relief as the Court deems just and proper.

## COUNT VIII

***Negligent Misrepresentation — Pleaded in the Alternative (Against NSU)***

141. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 14 and 42 through 83 as though fully set forth herein.

142. In the course of administering Ms. Wilkes's accommodation process and CSP proceedings, NSU supplied false information, or supplied information without reasonable care as to its truth, for Ms. Wilkes's guidance in connection with her continued participation in the program.

143. Specifically, on or about August 7, 2022, Dr. Heather Knoeferl represented to Ms. Wilkes that her "case does not rise to" the level of dismissal—a representation of then-existing fact concerning the status and posture of Ms. Wilkes's matter.

144. That representation was false when made. As NSU's own internal communication reflects, by no later than August 15, 2022—and contemporaneous with the referral process

then underway—Dr. Paula Lowrey wrote that Ms. Wilkes "appears will have to start over in the OTD," indicating that NSU had already determined or was actively pursuing an outcome inconsistent with the representation that her matter did not rise to dismissal.

145. Identifying the particulars required by Rule 9(b): the speaker was Dr. Heather Knoeferl (with the contrary internal determination reflected by Dr. Paula Lowrey); the statement was that Ms. Wilkes's "case does not rise to" dismissal; it was made on or about August 7, 2022, by email, in the course of the CSP referral process; it was false because NSU had already set in motion or determined an outcome requiring Ms. Wilkes to "start over in the OTD," as reflected in Dr. Lowrey's August 15, 2022 email; and Ms. Wilkes relied on it to her detriment as alleged below.

146. NSU intended, or reasonably should have expected, that Ms. Wilkes would rely on the representation in deciding whether to continue pursuing relief through NSU's processes, whether to participate candidly in the CSP process, and whether to disclose sensitive personal, medical, and mental-health information.

147. Ms. Wilkes justifiably relied on the representation, participating candidly in the CSP process and disclosing sensitive information rather than taking other steps to protect her academic standing.

148. As a direct and proximate result of NSU's negligent misrepresentation, Ms. Wilkes was induced to proceed on false pretenses, was deprived of a fair opportunity to protect her academic status, and was dismissed from the program, suffering damages including tuition and educational expenses, delay and loss of degree progress, damage to future educational and professional opportunities, and other consequential damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against NSU for compensatory damages, costs, prejudgment interest as allowed by law, and such other relief as the Court deems just and proper.

**COUNT IX**

***Unjust Enrichment — Pleaded in the Alternative Only (Against NSU)***

149. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 14 and 25 through 83 as though fully set forth herein.

150. This Count is pleaded strictly in the alternative to Plaintiff's contract-based claims, and only to the extent the Court determines that no enforceable contract governs the subject matter of the benefits conferred on NSU.

151. Ms. Wilkes conferred substantial benefits on NSU, including the $1,000 acceptance and preregistration fee, tuition, mandatory fees, and other monies paid to enroll in and continue attending NSU's M.O.T. program.

152. NSU knowingly accepted, received, and retained those benefits.

153. Ms. Wilkes conferred those benefits with the reasonable expectation that NSU would provide her access to the program and administer her enrollment, accommodation process, and progression in accordance with its published policies and representations.

154. Under the circumstances alleged, it would be inequitable for NSU to retain those benefits without restitution, where NSU failed to administer Ms. Wilkes's accommodation process, used accommodation-related issues against her, recorded a "failure" for a course with a passing gradebook total, and dismissed her under a rule she did not trigger.

155. This Count does not challenge NSU's academic judgment or quality of instruction; Ms. Wilkes seeks restitution of monies NSU retained under circumstances in which NSU did not equitably provide the administrative and accommodation-related benefits for which she paid.

156. As a direct and proximate result, NSU has been unjustly enriched at Ms. Wilkes's expense, and Ms. Wilkes has suffered damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against NSU for restitution, disgorgement, prejudgment interest as allowed by law, costs, and such other relief as the Court deems just and proper.

## COUNT X

***Negligent Supervision (Against NSU)***

157. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 14 and 25 through 83 as though fully set forth herein.

158. This Count concerns NSU's administration of a process it voluntarily undertook—the receipt of disability-related information, the approval and implementation of accommodations, and the handling of related student-progress proceedings—and not any academic or grading judgment or the quality of instruction.

159. Having undertaken to receive Ms. Wilkes's disability disclosures, approve accommodations, and implement them through designated personnel, NSU assumed a duty to exercise reasonable care in supervising the personnel charged with carrying out that process.

160. NSU had notice that its personnel were mishandling Ms. Wilkes's accommodations and disability-related information: NSU knew its approved accommodations had been circulated to faculty yet were not provided on the June 28, 2022 midterm; NSU knew faculty were invoking Ms. Wilkes's accommodations against her; and NSU knew, through Dr. Lowrey's and other personnel's communications, that Ms. Wilkes's confidential disability-related disclosures were being used in connection with CSP referrals.

161. Despite that notice, NSU failed to use reasonable care to supervise the personnel responsible, failed to ensure that approved accommodations were implemented through the channels NSU established, and failed to intervene after personnel had notice that Ms. Wilkes's confidential disability-related disclosures were being used against her.

162. It was reasonably foreseeable that, absent reasonable supervision, Ms. Wilkes would lose the benefit of her approved accommodations and be subjected to a distorted progression and dismissal process.

163. As a direct and proximate result of NSU's negligent supervision, Ms. Wilkes suffered dismissal, loss of tuition, fees, and related educational expenditures, additional debt and financial harm, loss of educational and professional opportunities, and other damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against NSU for compensatory damages, prejudgment and postjudgment interest as allowed by law, costs, and such other relief as the Court deems just and proper.

## COUNT XI

### *Negligent Training (Against NSU)*

164. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 14 and 25 through 83 as though fully set forth herein.

165. This Count concerns NSU's administration of the accommodation and related processes it voluntarily undertook, and not any academic or grading judgment or the quality of instruction.

166. Having undertaken to provide disability accommodations and to administer related processes through its Office of Student Disability Services, program leadership, faculty, and testing personnel, NSU assumed a duty to exercise reasonable care in training the personnel responsible for reviewing accommodation requests, communicating approved accommodations, implementing testing and classroom accommodations, coordinating with testing and program faculty, and handling disability-related information in connection with student-progress proceedings.

167. NSU breached that duty by failing to adequately train the personnel responsible, such that Ms. Wilkes's approved accommodations were administered inconsistently and were not provided on the OCT 6106 midterm, and such that personnel funneled Ms. Wilkes's disability-related disclosures and accommodation-related conduct into disciplinary and CSP proceedings rather than addressing them through a properly functioning accommodation process.

168. It was reasonably foreseeable that, absent adequate training, students such as Ms. Wilkes would be denied approved accommodations and subjected to improper reliance on disability-related conduct in academic and disciplinary proceedings.

169. As a direct and proximate result of NSU's negligent training, Ms. Wilkes suffered loss of the benefit of her approved accommodations, adverse academic consequences, loss of continued participation, tuition and fee losses, loan-related and economic harm, loss of educational and professional opportunity, and other damages to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against NSU for compensatory damages, prejudgment and postjudgment interest as allowed by law, costs, and such other relief as the Court deems just and proper.

## COUNT XII

***Florida Deceptive and Unfair Trade Practices Act, §§ 501.201 et seq. (Against NSU)***

170. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 24, 70-71, 83, and 179 as though fully set forth herein.

171. At all material times, NSU was engaged in trade or commerce by advertising, offering, and providing educational services for payment, including by admitting students to and

enrolling them in its M.O.T. program and collecting the acceptance and preregistration fee, tuition, and related fees.

172. NSU committed a deceptive act or unfair practice independent of any breach of contract: at the time it induced Ms. Wilkes to apply, accept admission, and pay the nonrefundable acceptance fee and tuition, NSU did not disclose—in its acceptance materials or on its public website—that hers was the final M.O.T. cohort and that the program was being discontinued, even though that fact was material to a reasonable prospective student's enrollment decision and bore directly on the availability of the ordinary course-retake pathway.

173. NSU's own records confirm the pre-enrollment omission and its materiality. As of May 6, 2021, NSU's public M.O.T. webpage contained no notice of discontinuation. By August 1, 2021—after Ms. Wilkes had enrolled and paid—NSU had edited that webpage to add that the M.O.T. program "is transitioning to a Doctor of Occupational Therapy (O.T.D.) program and is no longer accepting new applicants." The nondisclosure was also inconsistent with the disclosure standard reflected in section 1005.04(1)(a) and (e), Florida Statutes, which Plaintiff invokes as a standard informing the deception and unfairness analysis under FDUTPA, not as an independent cause of action.

174. Identifying the particulars to the extent Rule 9(b) applies: the actor was NSU; the deception was the omission of the M.O.T. program's discontinuation from NSU's acceptance materials and public website at the time of Ms. Wilkes's enrollment; the timing was on or about March through August 2021, with the curative website edit added between May 6, 2021 and August 1, 2021; the medium was NSU's acceptance materials and public website; and NSU thereby obtained Ms. Wilkes's nonrefundable fee, tuition, and continued enrollment.

175. That omission was material and was likely to mislead a reasonable student acting in the same circumstances in deciding whether to pay for and enroll in NSU's M.O.T. program.

176. As a direct and proximate result of NSU's deceptive and unfair conduct, Ms. Wilkes suffered actual damages, including the $1,000 acceptance and preregistration fee, tuition, mandatory fees, and other out-of-pocket educational expenses. Ms. Wilkes seeks the actual damages recoverable under FDUTPA, together with attorneys' fees and costs as authorized by statute.

**WHEREFORE**, Plaintiff demands judgment against NSU for actual damages recoverable under FDUTPA, attorneys' fees and costs pursuant to statute, prejudgment interest where allowed, and such other relief as the Court deems just and proper.

**COUNT XIII**

***Declaratory Judgment, 28 U.S.C. §§ 2201–2202 (Against NSU)***

177. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 5 through 20 and 42 through 83 as though fully set forth herein.

178. An actual, present, and justiciable controversy exists between Ms. Wilkes and NSU concerning whether NSU's entry of a grade of "F" for OCT 6106—notwithstanding the 83.6% course total recorded in NSU's own gradebook—and her resulting dismissal under the two-failure rule, were contrary to NSU's own published academic and progression policies and to its obligations of equal access.

179. The controversy is concrete and ongoing. NSU maintains a "dismissed" designation on Ms. Wilkes's transcript, has refused to remove it; an official transcript NSU issued on December 31, 2025 continues to bear the "F" and the "Dismissed from Program" notation; and that designation continues to injure Ms. Wilkes by impairing her ability to pursue further education, including re-entry or continuation through the OTD pathway and admission to other institutions.

180. Ms. Wilkes is entitled to a declaration that: (a) under NSU's published grading policy, the 83.6% course total recorded in NSU's own gradebook for OCT 6106 constituted passing performance, not a "failure"; (b) Ms. Wilkes did not have the two course failures that NSU's published rule required as the predicate for dismissal—under NSU's published standard she had no qualifying failure, and even crediting the recorded "F," she had one; and (c) NSU's entry of the "F" and the resulting "Dismissed from Program" designation were contrary to NSU's published policies.

181. A declaration will resolve the controversy, clarify and settle the parties' legal relations, and afford relief from the uncertainty and continuing injury giving rise to this dispute. Declaratory relief is appropriate under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

**WHEREFORE**, Plaintiff demands entry of a declaratory judgment as set forth above; such further necessary or proper relief under 28 U.S.C. § 2202, including an order directing NSU to correct the "dismissed" designation on Ms. Wilkes's transcript consistent with the declaration; costs; and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Savannah Wilkes, respectfully requests that this Court enter judgment in her favor and against Defendant, Nova Southeastern University, Inc., and award the following relief to the extent available under the respective causes of action:

1. Compensatory damages in an amount to be proven at trial, including tuition and fees, out-of-pocket educational costs, loan-related consequences, consequential economic loss, and loss of educational and professional opportunity;
2. A declaratory judgment as set forth in Count XIII, and declaratory relief as pleaded in the respective counts;
3. Injunctive and other equitable relief as pleaded in the respective counts, including an order directing NSU to provide non-discriminatory reconsideration of, and to correct, the "dismissed" designation on Plaintiff's transcript;
4. Restitution and disgorgement as pleaded in Count IX;
5. Reasonable attorneys' fees where authorized by statute or other applicable law, including under Section 504, the ADA, and FDUTPA;
6. Taxable costs of this action as allowed by law;
7. Prejudgment and postjudgment interest as allowed by law;
8. Leave to amend to the extent the Court finds any count subject to dismissal; and
9. Such other and further relief, at law or in equity, as the Court deems just and proper.

To the extent any claim for punitive damages may be available, Plaintiff will seek leave of Court to assert such a claim by amendment pursuant to section 768.72, Florida Statutes, and applicable law, and only as to those causes of action for which such damages are legally available.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: June 10, 2026

Respectfully submitted,

/s/ Zachary Gaynor
Zachary Gaynor, Esq.
Florida Bar No. 125534
FLeducationlawyer.com
8903 Glades Rd, Ste A8 #2322
Boca Raton, FL 33434
Telephone: (561) 308-9119
Email: Zachary@FLeducationlawyer.com
Email: Zacharysgaynor@gmail.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 10, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve a copy on all counsel of record.

/s/ Zachary Gaynor
Zachary Gaynor, Esq.