**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:26-CV-61429-KUNTZ/AUGUSTIN-BIRCH**

**SAVANNAH WILKES,**

**Plaintiff,**

**v.**

**NOVA SOUTHEASTERN UNIVERSITY,**

**Defendant.**
_______________________________________/

# REPORT AND RECOMMENDATION ON MOTION TO DISMISS [DE 9]

This cause comes before the Court on Defendant Nova Southeastern University's Motion to Dismiss Plaintiff's First Amended Complaint [DE 9]. The Honorable Ed Artau, United States District Judge, has referred the Motion to the undersigned United States Magistrate Judge for appropriate disposition. DE 33. Subsequent to that referral, Judge Artau transferred this case to the Honorable Jeffrey T. Kuntz, United States District Judge. DE 34. The Court has carefully reviewed the Motion, Response [DE 12], Reply [DE 16], Plaintiff's Notices of Supplemental Authority [DE 14, 22, 38, 39, 40, and 41], the entire record, and is otherwise fully advised in the premises.

For the reasons set forth below, the Court **RECOMMENDS** that Defendant's Motion to Dismiss Plaintiff's First Amended Complaint [DE 9] be **GRANTED IN PART** and **DENIED IN PART.**

## I. Plaintiff's First Amended Complaint

### A. Plaintiff's Allegations

In her First Amended Complaint ("FAC"), Plaintiff alleges that Defendant discriminated against her because of her disability by, among other things, approving accommodations and then

failing to implement them, in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. DE 7. Specifically, Plaintiff alleges that she is a qualified individual with a disability due to multiple medical conditions and associated complications, "including documented psychological and psychiatric conditions (anxiety, depression, and attention-related impairments) and an autoimmune condition." *Id.* ¶ 25. Plaintiff further alleges that each of these medical conditions "substantially limits one or more major life activities, including concentrating, learning, and the operation of major bodily functions." *Id.*

Moreover, Plaintiff alleges that, on or about March 29, 2021, she was accepted into Defendant's Master of Occupational Therapy ("MOT") program. *Id.* ¶ 15. Upon acceptance, Plaintiff paid the required $1,000 fee to secure her place in the incoming class and thereafter paid all required tuition and other fees. *Id.* ¶ 16. At the time, Defendant's then-operative catalog set forth various requirements, policies, and procedures governing the MOT program, including that (1) "to be eligible for the [MOT] degree students shall 'have satisfactorily completed the program of study required for the degree (99 semester hours) with a minimum grade of 78 percent in each [occupational therapy ('OCT')] course . . . and a minimum cumulative GPA of 2.3'"; (2) a "passing grade" for each OCT course required a "C+ (78 percent) or above," such that a "failure" was defined as "[b]elow a C+ (78 percent)"; (3) "[a] course may be repeated only once"; (4) "[s]tudents will be dismissed from the program after two course failures"; (5) "[w]hen applicable, students who fail a course will be required to suspend their studies and request in writing to the program director and/or department chair for permission to retake the course when it is offered the next academic year"; and (6) "[t]here are no course remediations offered in the Department of Occupational Therapy." *Id.* ¶¶ 17–19.

At the time of her acceptance and enrollment, Plaintiff was not informed that the program was slated for termination or that her cohort would be the final cohort admitted to the program. *Id.* ¶ 21. In fact, as of May 6, 2021, Defendant's website "contained no disclosure that the program was being discontinued or was no longer accepting applicants." *Id.* ¶ 22. During Plaintiff's orientation that same month, however, she was informed that the MOT program was indeed being discontinued. *Id.* Still, it was not until August 1, 2021 that Defendant announced on its website that its MOT program would be "transitioning to a Doctor of Occupational Therapy (O.T.D.) program and [would] no longer accept[] new applicants." *Id.* ¶ 23. According to Plaintiff, the MOT program's discontinuation "meant that the ordinary course-retake pathway contemplated by [Defendant's policy] would not be available to [Plaintiff] in the ordinary course if she were recorded as having failed an [MOT] course." *Id.* ¶ 24.

Beginning in July 2021, Plaintiff disclosed her disabilities to several members of Defendant's faculty. *Id.* ¶ 26. Specifically, on or about July 26, 2021, Plaintiff disclosed to her professor, Heather Knoeferl, "that she had autoimmune health issues and suffered from anxiety and depression, that she was unable to control these conditions fully, and that she wanted these conditions taken into consideration by the school." *Id.* In October 2021, Plaintiff disclosed her mental-health struggles to two additional members of Defendant's faculty, explaining that she was experiencing depression and struggling to cope with several recent losses, including the death of a classmate and multiple deaths in her family. *Id.* ¶ 27. A few months later, "[o]n or about January 22 and February 7, 2022, Plaintiff told faculty that she was working with a school counselor and was managing depression and anxiety." *Id.* ¶ 28.

Additionally, "on or about February 18, 2022, [Plaintiff] met with her academic advisor regarding her mental-health concerns and her desire for accommodations." *Id.* ¶ 29. At that

meeting, Plaintiff "disclosed that she took medication, had upcoming medication adjustments because her anxiety and depression were increasing and making it difficult to focus in class, and that her autoimmune condition at times made it difficult to get out of bed." *Id.* "When asked what accommodations would assist her, Plaintiff identified increased time for exams, a separate testing room to reduce distractions, and blank paper during exams." *Id.* At the conclusion of that meeting, Plaintiff "was told that Dr. Paula Lowrey required documentation from a mental-health provider stating that [Plaintiff] could continue in the program and what she needed to support her health." *Id.* ¶ 30.

Approximately three (3) weeks later, Plaintiff "advised faculty that she was struggling to attend class and would obtain a letter from her therapist in support of accommodations, as requested by Dr. Lowrey." *Id.* ¶ 31. Accordingly, "[o]n or about March 8, 2022, [Plaintiff's] treating therapist provided a letter to Dr. [] Lowrey requesting accommodations for [Plaintiff], including additional time and test-taking in a calmer and more private space." *Id.* ¶ 32. One day later, "[Plaintiff] submitted a formal Academic Accommodation Request Form to [Defendant's] Office of Student Disability Services and provided a release of information listing attention disorders and psychological and psychiatric disabilities." *Id.* ¶ 33. Specifically, Plaintiff requested "private testing and additional testing time; additional time on assignments; tutoring; and authorization to attend class via Zoom when her disability (not merely illness or COVID-19) required." *Id.*

Thereafter, on or about April 18, 2022, Defendant's "Director of Student Disability Services, presented a drafted approved-accommodations memorandum," which Dr. Lowrey promptly approved. *Id.* ¶ 37. Plaintiff's approved accommodations included (1) "1.5x the standard time"; (2) "a reduced-distraction testing setting that could include other accommodated students";

and (3) "'[e]xtended time to complete assignments, when necessary and mutually agreed upon by student and faculty member,' under which faculty would determine how much additional time would be allowed, with new deadlines 'negotiated between student and professor.'" *Id.* ¶¶ 38–39. Defendant notified Plaintiff of these accommodations, "instructed her to read, initial, and return the agreement, and designated Dr. Lowrey as her ADA contact to explain how the accommodations would be provided and the testing protocol." *Id.* ¶ 37. Additionally, "[o]n or about April 26, 2022, Dr. [] Lowrey circulated [Plaintiff's] list of approved academic accommodations by email to her faculty and program personnel." *Id.* ¶ 41.

Plaintiff alleges that "[t]he final accommodation memo did not approve private testing, blank paper during examinations, tutoring, or disability-related Zoom attendance, and [Defendant] did not provide a clear denial or appealable determination as to those requested accommodations." *Id.* ¶ 38. Additionally, Plaintiff proffers that requiring her "to negotiate extensions on an assignment-by-assignment basis with individual faculty . . . did not provide clear, consistent, or predictable access when her disability symptoms affected her performance," and that Defendant did not "implement the approved testing and assignment accommodations through a defined process," but instead "left implementation to ad hoc, faculty-by-faculty handling." *Id.* ¶¶ 40, 42.

In fact, Plaintiff alleges that when she sat for the midterm examination in her OCT 6106 course (the "OCT Course") on June 28, 2022, Defendant "did not provide either of her approved examination accommodations—the 1.5x time or the reduced-distraction setting—for that midterm." *Id.* ¶ 44. Plaintiff scored a 68 percent on that exam – the lowest score in the class. *Id.* Plaintiff alleges that, "[as] a result of [Defendant's] failure to provide her approved examination accommodations, [her] score on the [OCT Course] midterm was lower than it would have been had the accommodations been provided." *Id.* ¶ 46. Additionally, Plaintiff alleges that both faculty

members responsible for the OCT Course had actual notice of her approved accommodations before and after the midterm examination was administered but Defendant "did not offer to re-administer the midterm with accommodations, adjust the score, or otherwise cure the failure." *Id.* ¶¶ 45, 47.

Moreover, Plaintiff alleges that "[b]eginning in late spring 2022, [Defendant's] faculty invoked [her] accommodations as a basis for criticism rather than support." *Id.* ¶ 48. Specifically, Plaintiff alleges that (1) on or about May 31, 2022, one faculty member "emailed [her] stating 'Per your accommodations,' referencing an accommodation [Plaintiff] had not requested for missing a class session"; and (2) on or about June 1, 2022, another faculty member "emailed [her] stating that '[they] need[ed] to adhere to the accommodation as it [was] written.'" *Id.* ¶¶ 48–49. Plaintiff also alleges that, on or about June 9, 2022, the same faculty member who had emailed her on June 1 "contacted [her] to discuss the process for using her accommodations when she was 'not feeling well,'" notwithstanding that Plaintiff had no approved accommodation permitting her to miss class. *Id.* ¶ 50.

Plaintiff further alleges that, on or about July 29, 2022, one of the professors in the OCT Course emailed her – copying Dr. Lowry and another member of Defendant's faculty – "asserting that, since the midterm examination, [Plaintiff] had 'professional behavior' issues that needed to be discussed and documented." *Id.* ¶ 51. Three (3) days later, two faculty members "referred [Plaintiff] to the Committee on Student Progress ('CSP'), citing an '[a]cademic issue,' a 'violation of professional or behavioral code of conduct,' and an asserted 'inability to meet OT essential functions'" (the "First CSP Referral"). *Id.* ¶ 52.

According to Plaintiff, the First CSP Referral "expressly relied on accommodation-related matters," stating among the reasons for the same that Plaintiff "had 'expressed not knowing she

had accommodations' and that she did 'not communicate as per accommodations when requiring extension on assignments or need to miss class.'" *Id.* ¶ 53. Plaintiff alleges that "[b]efore referring [her] for an asserted inability to meet OT essential functions, [Defendant] did not perform any analysis of whether those functions could be met with appropriate accommodations." *Id.* ¶ 54. Plaintiff was notified of the First CSP Referral on August 5, 2022, and a hearing was set for August 16. *Id.* ¶ 56. On August 7, 2022, Plaintiff alleges that "in response to [her] expressed concern, Dr. [] Knoeferl stated that, although CSP can be a means to evaluate dismissal, [Plaintiff's] 'case [did] not rise to that level.'" *Id.* ¶ 57.

On or about August 9, 2022, Plaintiff sat for the OCT Course final examination, earning a score of 76.4 percent. *Id.* ¶ 58. Per the OCT Course's Canvas gradebook, as of August 15, 2022, Plaintiff had a course total of 83.6 percent – well "above the published 78 percent minimum for OCT courses." *Id.* Approximately one week later, on August 15, 2022, another member of Defendant's faculty "referred [Plaintiff] to CSP for asserted 'Academic issues' and a 'Violation of professional or behavioral code of conduct'" (the "Second CSP Referral"). *Id.* ¶ 59. That same day, Dr. Lowrey "emailed program personnel stating that [Plaintiff] '[was] a year 2 student and it appear[ed] [would] have to start over.'" *Id.* ¶ 60.

Plaintiff was notified of the Second CSP Referral on August 18, 2022, and a hearing was set for August 23. *Id.* ¶ 61. The notice's stated reason for the Second CSP Referral was identified as "Academic Issues: Course failure for OCT 6106" and a "Violation of professional or behavioral code of conduct: Class attendance." *Id.*

The hearing on the First CSP Referral was held on August 16, 2022. *Id.* ¶ 63. The First CSP Referral was resolved "by directing [Plaintiff] to research three time-management strategies, select one for a written action plan, and write a reflection—citing the Student Handbook's

'Disciplinary Warning' provision." *Id.* ¶ 64. One week later, on August 23, 2022, the hearing on the Second CSP Referral was held. *Id.* ¶ 65. That same day, Plaintiff received notice of the CSP committee's decision that "[Plaintiff] suspends her studies in accordance with the policy," quoting several provisions of Defendant's handbook, including that (1) "[w]hen applicable, students who fail a course will be required to suspend their studies and request in writing to the program director and/or department chair for permission to retake the course when it is offered the next academic year"; (2) "[a] course may be repeated only once"; and (3) "[s]tudents will be dismissed from the program after two course failures." *Id.* ¶ 68. The committee's decision "further acknowledged that 'there [was] no prescribed opportunity for a student in the MOT program' to request permission to retake the course 'due to the sunset/termination of [the] MOT program,' and provided for a 'point person' to advise [Plaintiff] 'should [she] choose to re-enter in the OTD program.'" *Id.*

After receiving this decision, Plaintiff sought clarification on whether she was being dismissed from the MOT program. *Id.* ¶ 69. Defendant's faculty member "responded that '[d]ue to our policy on course failure, it's a dismissal.'" *Id.* According to Plaintiff, however, "[t]he published rule [Defendant] invoked authorizes dismissal only 'after two course failures,'" but "[u]nder [Defendant's] published 78 percent standard and [its] own gradebook, [Plaintiff] had no qualifying course failure in [the OCT Course] or any other course." *Id.* ¶ 70. Even crediting the course failure Defendant entered for the OCT Course, Plaintiff alleges she would have "a single recorded course failure—not two." *Id.* Additionally, Plaintiff alleges that when she "asked why her accommodations and medical circumstances were not discussed at the hearing, [Defendant's faculty member] stated that the 'goal of the accommodations that [Plaintiff was] granted is for student success.'" *Id.* ¶ 72. In response, Plaintiff stated "that she did not believe her accommodations had been properly provided or taken into consideration." *Id.*

As a result of the CSP Committee's decision, Plaintiff's transcript reflected a failing grade ("F") in the OCT Course and indicated that she had been dismissed from the MOT program, as evidenced by two separate notations: (1) "Dismissed from Program," and (2) "Last Standing: Dismissed from Program." *Id.* ¶ 71. Plaintiff alleges that these transcript entries directly contradicted both her final grade of 83.6 percent in the OCT Course – well above the 78 percent passing threshold – and the CSP Committee's written decision, which stated that she had "suspended" her studies rather than been dismissed from the program. *Id.* Plaintiff further alleges that, even accounting for the disputed failing grade, her cumulative GPA at the time of her dismissal was 2.69 – well above the program's 2.3 minimum GPA requirement. *Id.* ¶ 73.

Still, on or about September 18, 2022, Plaintiff alleges that she "asked the [Defendant's] Registrar's office about the appeal process for an academic dismissal," but did not receive a response. *Id.* ¶ 74. Additionally, "[o]n or about October 31, 2022, [Defendant] told [Plaintiff] [that] it was unable to remove the 'dismissed' status from her transcript." *Id.* ¶ 76. To date, "Defendant has continued to maintain that designation on [Plaintiff's] transcript." *Id.*

Plaintiff further alleges that, "[o]n or about October 5 and November 11, 2022, [Defendant's faculty member] advised [Plaintiff] to consider applying to occupational-therapy-assistant (OTA) programs and stated that the OTD program was at a higher rigor," and "also stated that [Defendant] would have difficulty providing a recommendation letter consistent with FERPA." *Id.* ¶ 75. Plaintiff alleges that through the rest of 2022 and into 2023, she "sought review through [Defendant's] Office of the Dean of Students and related personnel, recounting that she had been required to share personal mental-health information that was then used against her in her dismissal, and asking whether that constituted discrimination," but Defendant did not provide her with "a substantive resolution." *Id.* ¶ 78. Thereafter, "[o]n or about January 23, 2023, after

[Plaintiff] communicated that she had been treated poorly and was considering legal advice, [Defendant's faculty member] spoke with [her] by telephone and told her, in substance, to 'move on.'" *Id.* ¶ 79. Plaintiff further alleges that "[o]n or about April 17, 2023, a Senior Admission Counselor at Creighton University informed [her] that her [MOT] dismissal would be a major obstacle to overcome in seeking admission elsewhere." *Id.* ¶ 80.

Plaintiff alleges that "[a]s a result of [Defendant's] conduct, [she] lost the benefit of her tuition and fees, incurred additional debt and economic harm, suffered the loss of continued participation in the program, experienced delay and impairment of her education and intended occupational-therapy career, and continues to bear a transcript designation reflecting a 'dismissal' that [Defendant's] own published rules did not authorize." *Id.* ¶ 83.

### B. Plaintiff's Causes of Action

Based on the foregoing, Plaintiff pleads thirteen (13) counts – Disability Discrimination and Failure to Accommodate under the Rehabilitation Act (Count I); Retaliation under the Rehabilitation Act (Count II); Disability Discrimination and Failure to Make Reasonable Accommodations under the ADA (Count III); Retaliation and Interference under the ADA (Count IV); Breach of Contract (Count V); Breach of the Implied Covenant of Good Faith and Fair Dealing (Count VI); Promissory Estoppel (Count VII); Negligent Misrepresentation (Count VIII); Unjust Enrichment (Count IX); Negligent Supervision (Count X); Negligent Training (Count XI); Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count XII); and Declaratory Judgment (Count XIII).

## II. Defendant's Motion to Dismiss

Defendant now moves to dismiss the FAC based on it being a shotgun pleading. Additionally, Defendant moves to dismiss Counts II through XIII on other grounds.

**A. Shotgun Pleading**

In its Motion to Dismiss, Defendant argues that Plaintiff's FAC is a shotgun pleading. DE 9 at 3–5; DE 16 at 2.

A shotgun pleading violates the requirement that a pleading contain a short and plain statement of the claim showing that the pleader is entitled to relief. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294–95 (11th Cir. 2018); *see* Fed. R. Civ. P. 8(a)(2) (requiring a pleading to contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief"). There are four basic categories of shotgun pleadings. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). A pleading is shotgun if it: (1) contains "multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (2) is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) does not separate each cause of action or claim for relief into a different count; or (4) asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1321–23. Importantly, "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323. "In other words, shotgun pleadings make it *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief." *Okposio v. Barry Univ., Inc.*, No. 22-13845, 2023 WL 7484223, at *2 (11th Cir. Nov. 13, 2023) (quotation marks omitted) (emphasis in original).

Here, Defendant contends that Plaintiff's FAC falls squarely under the second category. DE 9 at 4; DE 16 at 2. Specifically, Defendant argues that most counts in the FAC "incorporate the bulk of the general allegations," thereby sweeping in numerous "matters bearing no apparent connection" to the claims asserted in those counts, and failing to indicate which allegations are material to which count. DE 9 at 4. As its only example, Defendant points the Court to Count XII, where the FAC seeks to incorporate paragraph 179. *Id.* That paragraph, however, appears later in the pleading, within Count XIII. *Id.* at 5. This "error," Defendant argues, "confirms that the incorporation ranges were assembled without the care that fair notice requires." *Id.*

As an initial matter, incorporating most or all the factual allegations into each count is a common pleading practice and does not, by itself, render a complaint a shotgun pleading. *See Luthra v. Univ. of Mia.*, 822 F. Supp. 3d 1299, 1306 (S.D. Fla. 2026) ("Here, each count of the Complaint merely incorporates all the factual allegations. That is common practice."). Moreover, Plaintiff's FAC does not otherwise fall under the second category of shotgun pleadings – it is not plagued by conclusory, vague, or immaterial facts; nor does it leave the reader to speculate as to which factual allegations pertain to which count. Instead, the FAC presents facts in chronological order, describing events before, during, and after the alleged unlawful conduct. Each count in the FAC then adopts and realleges *specific* paragraphs from the FAC's factual allegations.

A single "mis-numbered cross-reference," DE 12 at 6, does not render the FAC a shotgun pleading. Nor do allegations that may be irrelevant to a particular count warrant that characterization; such allegations may simply be disregarded as surplusage. Neither deficiency rises to the level of a shotgun pleading. *See Okposio*, 2023 WL 7484223, at *3 ("Finally, though the complaint contains surplusage, that defect alone does not preclude defendants from understanding the claims lodged against them."). Indeed, the Court observes that Defendant has

responded substantively to the claims brought against it, belying an argument that it does not have adequate notice of the claims against it or the grounds upon which each claim rests. Accordingly, Plaintiff's FAC is not a shotgun pleading.

**B. Count III**

Defendant argues that Count III should be dismissed because Plaintiff lacks standing to seek declaratory and injunctive relief under the ADA. DE 9 at 5–6; DE 16 at 2–3. As Plaintiff's basis for standing to seek prospective relief, she relies on the "dismissed" designation Defendant placed and maintains on her transcript. DE 7 ¶ 110. Plaintiff alleges that she "intends to pursue further occupational-therapy education," including re-entry or continuation through Defendant's OTD pathway and/or admission to other institutions, and that the dismissal designation is the obstacle to doing so. *Id.* ¶¶ 110, 116, 179. Defendant, however, argues that the transcript notation "is a past act with ongoing consequences; it is not an ongoing course of discriminatory conduct that a forward-looking injunction from this Court would redress." DE 9 at 5.

To establish standing under Article III of the Constitution, a plaintiff must allege an injury-in-fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Defendant only challenges whether Plaintiff has sufficiently alleged an injury-in-fact, so the Court narrows its focus accordingly. When seeking injunctive relief, a plaintiff "must show past injury and a real and immediate threat of future injury." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013). Additionally, where, as here, a defendant mounts a facial attack to subject matter jurisdiction, the Court "merely [] look[s] and see[s] if the plaintiff's complaint has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [her] complaint are taken as true for the purposes of the motion." *Id.* at 1335–36; *see also DHTK, LLC v. Unknwn, LLC*, No. 1:19-CV-61627, 2020 WL 4932237, at *2 (S.D. Fla. July 23, 2020) ("The Court treats

the Motions as a facial attack on the Complaint because Defendants base their standing argument on the pleadings alone.”).

Here, Plaintiff alleges that Defendant discriminated against her by approving accommodations and then failing to implement them during her June 2022 midterm examination. DE 7 ¶ 44. This failure to accommodate, Plaintiff alleges, caused her to earn a lower score on that examination than she would have received had the approved accommodations been provided. *Id.* ¶ 46. This eventually led to the Second CSP Referral, which was prompted by “academic issues,” including Plaintiff’s alleged failure of the OCT Course. *Id.* ¶¶ 59–61. Ultimately, Plaintiff received an “F” in the OCT Course and was dismissed from the MOT program, both of which are documented in her official transcript. *Id.* ¶ 71. To date, Defendant has continued to maintain both the “F” for the OCT Course and the dismissal designation on Plaintiff’s transcript. *Id.* ¶ 76.

Additionally, Plaintiff alleges that an official from a different institution – Creighton University – advised her that the dismissal would be a “major obstacle” in seeking admission to other programs. *Id.* ¶ 80. Plaintiff further alleges that she “intends to pursue further occupational-therapy education,” but that the dismissal designation forecloses her ability to pursue such education either via re-entry or continuation through Defendant’s OTD pathway, or via admission to other institutions. *Id.* ¶¶ 110, 116, 179. Accordingly, Plaintiff seeks injunctive and other equitable relief, “including an order directing [Defendant] to provide non-discriminatory reconsideration of, and to correct, the ‘dismissed’ designation on [her] transcript.” *Id.* at 29.

At this juncture, these allegations are sufficient to give rise to an inference that Plaintiff will suffer future discrimination. *See Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (emphasis added) (“In ADA cases, courts have held that a plaintiff lacks standing to seek injunctive relief ***unless*** [s]he alleges facts giving rise to an inference that [s]he will suffer future

discrimination"); *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 496 (4th Cir. 2005) (holding, on appeal from an order on a motion to dismiss, that Plaintiff sufficiently alleged standing for prospective relief under § 504 of the Rehabilitation Act when she alleged that the defendant university gave her a failing grade and later refused to make reasonable accommodations for her disability, and when she requested an order expunging the failing grade from her transcript or directing the university to permit a re-examination under reasonable circumstances). As such, Plaintiff's Count III should survive dismissal.

**C. Counts II and IV**

Plaintiff's Counts II and IV allege unlawful retaliation under the Rehabilitation Act and the ADA, respectively. As an initial matter, retaliation claims under either statute are governed by the same standards, so the Court discusses the claims together. *See Ypsilantis v. Yellen*, No. 22-CV-61514, 2023 WL 7524107, at *16 (S.D. Fla. Nov. 14, 2023) (explaining that "the Rehabilitation Act also prohibits retaliating against an [individual] for engaging in protected activity . . . The Rehabilitation Act does so by incorporating the ADA's anti-retaliation provision . . . ADA retaliation claims—and Rehabilitation Act retaliation claims—are analyzed under the same framework" (quotation marks omitted)).

To state a claim under either statute, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse action; and (3) there was a causal relationship between the action and her protected activity. *Id.* Here, Defendant does not dispute that Plaintiff has properly alleged the first two elements – that Plaintiff (1) engaged in protected activity when she requested accommodations, followed up on implementation of the same, asserted that the accommodations were not being provided, and asked that those accommodations be considered in the academic process, DE 7 ¶¶ 97, 113, and (2) suffered an adverse action, including the CSP

referrals and proceedings and the dismissal from Defendant's MOT program. *Id.* ¶¶ 98, 114. Defendant has thus forfeited any such argument. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue"); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief . . . are deemed waived.").

Rather, Defendant contends that Plaintiff does not plead the required causal link between the adverse action and the protected activity. DE 9 at 6–7; DE 16 at 4. "To prove a causal connection, [courts] require a plaintiff only to demonstrate that the protected activity and the adverse action were not *wholly unrelated.*" *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (emphasis in original) (quotation marks omitted); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("To establish the causal connection element, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." (quotation marks omitted)).

Here, Plaintiff alleges that the protected activity is the but-for cause of the adverse action. *See* DE 7 ¶ 99 ("A causal connection exists between the protected activity and the adverse action. [Defendant's] decisionmakers tied the adverse action to [Plaintiff's] accommodations and accommodation-related conduct: faculty invoked her accommodations against her . . . and the August 1, 2022 CSP referral expressly faulted her for 'express[ing] not knowing she had accommodations' and for failing to 'communicate as per accommodations.' The escalation followed [Plaintiff's] requests for accommodation, her efforts to secure implementation, and the under-accommodated June 28, 2022 midterm."); *id.* ¶ 114 ("After [Plaintiff] exercised her ADA rights, [Defendant] subjected her to materially adverse action—CSP referral, CSP proceedings, and dismissal—and did so because of her protected activity").

Accordingly, Plaintiff pleads in each of her retaliation counts that Defendant retaliated against her for engaging in protected activity by subjecting her to CSP proceedings and ultimately dismissing her from the MOT program. At this stage, Plaintiff does not have to prove her case; for purposes of a motion to dismiss, Plaintiff has adequately pled causation. *See Hyppolite-Marriott v. Fla. Dep't of Veterans Affs.*, No. 0:21-CV-60352-RS, 2021 WL 5529871, at *6 (S.D. Fla. Nov. 2, 2021). As such, Plaintiff's Counts II and IV should survive dismissal.

**D. Count V**

Defendant argues that Plaintiff's breach of contract claim should be dismissed because the contract provisions Plaintiff identifies do not impose the obligations Plaintiff's breach theory requires. DE 9 at 7; DE 16 4–5. In Florida, a plaintiff asserting a breach of contract claim must demonstrate (1) the existence of a valid contract, (2) a material breach, and (3) damages. *Ferretti v. Nova Se. Univ., Inc.*, 604 F. Supp. 3d 1330, 1333 (S.D. Fla. 2022). "Under Florida law, a private university's relationship with its students is an implied-in-fact contract arising from the university's rules, regulations, regimen, and publications at the time of enrollment." *Id.* at 1334. "The terms of this implied-in-fact contract may be derived from university publications such as the student handbook and catalog." *Id.* (quotation marks omitted).

Here, Plaintiff alleges that she had a contractual relationship with Defendant as a student attending a private university. DE 7 ¶ 119. Plaintiff further alleges that the relevant contract's terms included that (1) a "passing grade" for each OCT course required a "C+ (78 percent) or above," such that a "failure" was defined as "[b]elow a C+ (78 percent)"; (2) "[a] course may be repeated only once"; (3) "[s]tudents will be dismissed from the program after two course failures"; and (4) "[w]hen applicable, students who fail a course will be required to suspend their studies and request in writing to the program director and/or department chair for permission to retake the course when

it is offered the next academic year." *Id.* ¶¶ 17–19, 120. Finally, Plaintiff alleges that Defendant breached those terms by (1) giving her a failing grade in the OCT Course despite earning a course total of 83.6 percent – well above the published 78 percent minimum for OCT courses, *id.* ¶ 58, and (2) dismissing her from the MOT program despite her failure of at most a single course, not the required two courses. *Id.* ¶¶ 70–72.

At this juncture, nothing more is required. While Defendant advances arguments regarding contract interpretation, such arguments are inappropriate for resolution at the motion to dismiss stage. *See Greenway Nutrients, Inc. v. Selakovic*, No. 18-CV-81104, 2019 WL 1338588, at *10 (S.D. Fla. Feb. 14, 2019) ("Contract interpretation is typically inappropriate at the motion to dismiss stage."); *Geter v. Galardi S. Enters., Inc.*, 43 F. Supp. 3d 1322, 1328 (S.D. Fla. 2014) ("[T]he Court may not engage in contract interpretation at the motion to dismiss stage, as these arguments are more appropriate for summary judgment." (quotation marks omitted)); *Larach v. Standard Chartered Bank Int'l (Americas) Ltd.*, 724 F. Supp. 2d 1228, 1239 (S.D. Fla. 2010) (denying motion to dismiss because plaintiff had "sufficiently alleged the required elements for claims of breach of contract" and the differing interpretations of the contract was not yet ripe for ruling). As such, Plaintiff's Count V should survive dismissal.

**E. Count VI**

Defendant argues that Plaintiff cannot bring a separate count for breach of the implied covenant of good faith and fair dealing. DE 9 at 9. "Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1278 (S.D. Fla. 2009) (quotation marks omitted). As such, a "breach of the implied covenant of good faith and fair dealing is not an

independent cause of action, but attaches to the performance of a specific contractual obligation." *Id.* Defendant's argument is grounded in the principle of Florida law that "a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *Id.*

However, "where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Id.* Indeed, "as long as the implied covenant does not vary the express terms of the contract, the failure to perform a discretionary act in good faith may be a breach of the implied covenant of good faith and fair dealing." *Id.* at 1278–79.

Here, Plaintiff has alleged sufficient facts to show that Defendant acted in bad faith when it exercised its discretion under its catalog to dismiss Plaintiff. Thus, Plaintiff has stated a claim for this cause of action. *See id.* As such, Plaintiff's Count VI should survive dismissal.

**F. Count VII**

Defendant argues that Plaintiff's claim of promissory estoppel should be dismissed because the FAC fails to plead detrimental reliance. DE 9 at 9–10; DE 16 at 6. In Florida, the doctrine of promissory estoppel "applies when there is (1) a promise which the promisor should reasonably expect to induce action ***or forbearance***, (2) action ***or forbearance*** in reliance on the promise, and (3) injustice resulting if the promise is not enforced." *Bloch v. Wells Fargo Home Mortg.*, 755 F.3d 886, 889 (11th Cir. 2014) (emphasis added). Here, Plaintiff explicitly alleges that "[i]n specific reliance on [Defendant's] representation that the CSP process was supportive and that her matter did not rise to dismissal," Plaintiff "***forbore*** from taking other steps to protect her academic standing—such as seeking a contemporaneous leave of absence, pursuing immediate external

review, or otherwise guarding against an adverse outcome she had been assured was not in prospect." DE 7 ¶ 137 (emphasis added). Nothing more is required at this stage. As such, Plaintiff's Count VII should survive dismissal.

**G. Count VIII**

Defendant argues that Plaintiff's claim for negligent misrepresentation should be dismissed because it is not pleaded with the particularity required by Rule 9. DE 9 at 10; DE 16 at 6–7. In Florida, to assert a claim of negligent misrepresentation, a Plaintiff must show "(1) misrepresentation of a material fact; (2) that the representor made the misrepresentation without knowledge as to its truth or falsity or under circumstances in which he ought to have known of its falsity; (3) that the representor intended that the misrepresentation induce another to act on it; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation." *Serra-Cruz v. Carnival Corp.*, 400 F. Supp. 3d 1364, 1369 (S.D. Fla. 2019). "As an allegation of fraud, negligent misrepresentation is subject to the heightened pleading standard of Rule 9(b), which requires a plaintiff to establish the 'who, what, when, where, and how' of the fraud." *Id.* (quotation marks omitted); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Here, Plaintiff's claim of negligent misrepresentation satisfied Rule 9's heightened pleading requirement – Plaintiff alleges that (1) "on or about August 7, 2022, Dr. Heather Knoeferl represented to [Plaintiff] that her 'case does not rise to' the level of dismissal"; (2) Dr. Knoeferl knew that representation was false when made; (3) Defendant "intended, or reasonably should have expected, that [Plaintiff] would rely on the representation in deciding whether to continue pursuing relief through [Defendant's] processes, whether to participate candidly in the CSP

process, and whether to disclose sensitive personal, medical, and mental-health information"; and (4) Plaintiff was injured as a result thereof. DE 7 ¶¶ 141–48. Accordingly, Plaintiff alleges the "who, what, where, when, and how" of the alleged fraud. As such, Plaintiff's Count VIII should survive dismissal.

**H. Count IX**

Defendant argues that Plaintiff's claim for unjust enrichment should be dismissed because the parties' relationship is governed by an express contract. DE 9 at 11; DE 16 at 7. "Although a party may only recover under an unjust enrichment theory when there is no valid express or implied-in-fact contract, unjust enrichment and breach of contract may be pleaded in the alternative." *Gibson v. Lynn Univ., Inc.*, 504 F. Supp. 3d 1335, 1344 (S.D. Fla. 2020). Here, Plaintiff pleads this count in the alternative to her breach of contract claim. Accordingly, it would be premature to dismiss this count at this stage. *See id.* ("Thus, although the Amended Complaint adequately *pleads* the existence of a valid implied-in-fact contract, an undisputed express or implied-in-fact contract has yet to be established at this stage in the proceedings—and, therefore, dismissal of Plaintiff's unjust enrichment claim is not warranted." (emphasis in original)). As such, Plaintiff's Count IX should survive dismissal.

**I. Counts X and XI**

Defendant argues that Plaintiff's claims for negligent supervision and negligent training should be dismissed based on the independent tort doctrine. DE 9 at 12–13; DE 16 at 7–8. This argument fails, however, because the conduct Plaintiff relies on for these claims is separate and distinct from the conduct she relies on for her breach of contract claim. Indeed, "the independent tort doctrine does not bar claims where the plaintiff has alleged conduct that is independent from

acts that breached the contract and does not itself constitute breach of the contract at issue." *Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1311 (S.D. Fla. 2019).

Here, Plaintiff's negligent supervision and training claims are based on Defendant's mishandling of Plaintiff's accommodations and disability-related information, DE 7 ¶¶ 160, 166, while Plaintiff's breach of contract claim relies on Defendant's alleged breach of the parties' contractual terms, including that (1) a "passing grade" for each OCT course required a "C+ (78 percent) or above," such that a "failure" was defined as "[b]elow a C+ (78 percent)"; (2) "[a] course may be repeated only once"; (3) "[s]tudents will be dismissed from the program after two course failures"; and (4) "[w]hen applicable, students who fail a course will be required to suspend their studies and request in writing to the program director and/or department chair for permission to retake the course when it is offered the next academic year." *Id.* ¶¶ 17–19, 120. Accordingly, the independent tort doctrine does not preclude Plaintiff from asserting her negligence claims here, and Counts X and XI should survive dismissal.

**J. Count XII**

Defendant argues that Plaintiff's FDUTPA claim should be dismissed because it is not pleaded with the particularity required by Rule 9 and does not properly allege causation. DE 9 at 12–13; DE 16 at 8. "A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages." *Harris v. Nordyne, LLC*, No. 14-CIV-21884, 2014 WL 12516076, at *5 (S.D. Fla. Nov. 14, 2014).

As an initial matter, Rule 9's heightened pleading standard applies to FDUTPA clams when those claims sound in fraud. *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1292 (11th Cir. 2025). And, where, as here, "a plaintiff's allegations closely track the elements of common law fraud, then the plaintiff's claim sounds in fraud for purposes of Rule 9(b)." *Id.* at 1294.

Here, Plaintiff's FDUTPA claim satisfies Rule 9's heightened pleading requirement – Plaintiff alleges that (1) "at the time it induced [Plaintiff] to apply, accept admission, and pay the nonrefundable acceptance fee and tuition, [Defendant] did not disclose—in its acceptance materials or on its public website—that [Plaintiff's] was the final [MOT] cohort and that the program was being discontinued; (2) "that fact was material to a reasonable prospective student's enrollment decision and bore directly on the availability of the ordinary course-retake pathway"; (3) that omission "was likely to mislead a reasonable student acting in the same circumstances in deciding whether to pay for and enroll in [Defendant's MOT] program"; and (4) Plaintiff was injured as a result thereof. DE 7 ¶¶ 172–75. Accordingly, Plaintiff alleges the "who, what, where, when, and how" of the alleged FDUTPA violation.

Moreover, as to the causation element, Plaintiff has adequately alleged that Defendant's omissions were likely to deceive a consumer acting reasonably under the circumstances. "Reliance is not required for causation under FDUTPA." *Harris*, 2014 WL 12516076, at *7. "When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Id.* (quotation marks omitted). Here, Plaintiff alleges that Defendant's omission related to the MOT program's discontinuation "was likely to mislead a reasonable student acting in the same circumstances in deciding whether to pay for and enroll in [Defendant's MOT] program." DE 7 ¶ 175. A FDUTPA claim is properly stated under these allegations. As such, Plaintiff's Count XII should survive dismissal.

**K. Count XIII**

Finally, Defendant argues that Plaintiff's claim for declaratory judgment should be dismissed as redundant of Plaintiff's breach of contract claim. DE 9 at 15; DE 16 at 9. In this count,

Plaintiff seeks an order from the court that "(a) under [Defendant's] published grading policy, the 83.6% course total recorded in [Defendant's] own gradebook for OCT 6106 constituted passing performance, not a 'failure'; (b) [Plaintiff] did not have the two course failures that [Defendant's] published rule required as the predicate for dismissal—under [Defendant's] published standard she had no qualifying failure, and even crediting the recorded 'F,' she had one; and (c) [Defendant's] entry of the 'F' and the resulting 'Dismissed from Program' designation were contrary to [Defendant's] published policies." DE 7 ¶ 180. These are the same factual disputes Plaintiff alleges in support of her breach of contract claim.

Where, as here, determination of Plaintiff's breach of contract claim involves the same factual dispute as the declaratory relief claim, then Plaintiff will be able to secure full, adequate and complete relief through the breach of contract claim. *Ministerio Evangelistico Int'l v. United Specialty Ins. Co.*, No. 16-25313-CIV, 2017 WL 1363344, at *2 (S.D. Fla. Apr. 5, 2017). Consequently, "the declaratory action must be dismissed." *See id.*

## III. Conclusion

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's Motion to Dismiss Plaintiff's First Amended Complaint [DE 9] be **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Court **RECOMMENDS** that Count XIII of Plaintiff's First Amended Complaint be **DISMISSED**.

Additionally, because this Report and Recommendation does not identify any pleading deficiencies in Plaintiff's First Amended Complaint, the Court **RECOMMENDS** that Plaintiff's Motion for Leave to File a Second Amended Complaint [DE 21] be **DENIED**.

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations.

28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(a). The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3-1 (2014).

**DONE AND SUBMITTED** in Chambers at Fort Lauderdale, Florida, this 10th day of November, 2026.

PANAYOTTA AUGUSTIN-BIRCH
UNITED STATES MAGISTRATE JUDGE